841 F.2d 600
 Blue Sky L. Rep. P 72,734, 56 USLW 2604,
Fed. Sec. L. Rep. P 93,704,
RICO Bus.Disp.Guide 6909
 Sterling & Esther JENSEN, Plaintiffs-Appellants,
v.
George M. SNELLINGS, III & Snellings, Breard, Sartor,
Inabnett & Trascher, Defendants-Third Party
Plaintiffs-Appellees, Appellants.
GRANADA CORP., et al., Defendants-Appellees,
v.
APPALACHIAN INSURANCE CO., et al., Third Party Defendants, Appellees.
 No. 86-3488.
 United States Court of Appeals,
Fifth Circuit.
 April 6, 1988.
Rehearing Granted In Part May 6, 1988.*
 
 Donna C. Kline, Richard M. Martin, Jr., Cummings & Cummings, New Orleans, La., for plaintiffs-appellants.
 Kevin O'Bryon, W. Paul Andersson, Hammett, Leake & Hammett, New Orleans, La., for George Snellings, III.
 George Snellings, III, Monroe, La., pro se.
 Grant Cook, Thomas D. Cordell, Reynolds, Allen, Cook, Pannill & Hooper, Houston, Tex., and William T. D'Zurilla, Ewell E. Eagan, Jr., Gordon, Arate, McCollam & Stuart, New Orleans, La., for Granada defendants.
 J. Walter Ward, Jr., Kevin Tully, Raymond J. Salassi, Susan M. Weidner, New Orleans, La., for Snellings, Breard, Sartor, Inabnett & Trascher, Christovich & Kearney.
 Brent B. Barriere, New Orleans, La., for Bradshaw and E.F. Hutton & Co.
 Campbell E. Wallace, Frank V. LeBlanc, III, New Orleans, La., for Nat'l Union Fire Ins. Co., of Pittsburgh, Pa.
 H.F. Foster, III, New Orleans, La., for Imperial Cas.
 Phillip L. McIntosh, Monroe, La., for Snellings, Beard as appellant.
 Jack M. Alltmont, New Orleans, La., for Appalachian Ins. Co.
 Appeals from the United States District Court for the Eastern District of Louisiana.
 Before GARZA, REAVLEY and DAVIS, Circuit Judges.
 REAVLEY, Circuit Judge:
 
 
 1
 Plaintiffs, husband and wife, appeal the district court's ruling that their federal securities law and RICO claims for losses on investments, brought against their attorney, his firm, their broker, his brokerage firm, and the company in which they had invested, were time-barred. Additionally, the defendant attorney and his firm appeal the district court's determination that their professional liability insurers owed neither a duty to defend the suit nor coverage under the policies. We affirm the district court's dismissal of the federal securities law claims as barred by the statute of limitations. We reverse the district court's dismissal of the RICO claims, and remand the case for consideration of those claims. As to the portion of the court's decision dismissing the various third party claims against the insurers, we affirm in part, reverse in part, and remand.
 
 I. Background
 
 2
 In June 1977, Esther Jensen received approximately $3.5 million from the proceeds of the sale of a newspaper business owned by her family. She and her husband, Sterling, expressed interest in an investment program designed to minimize income tax liability that was being considered by her mother, Mildred Ewing, and her brother, Robert Ewing. The following month, Samuel Bradshaw, the account executive in the Dallas, Texas office of the brokerage firm of E.F. Hutton & Company, Inc., who was designing the investment program for the Ewings, contacted the Jensens. Bradshaw proposed that the Jensens invest in a cattle feeding investment plan offered by Granada Financial Services, Inc., a wholly owned subsidiary of Granada Corporation (collectively, "Granada"). He informed them that participation in the plan was contingent upon their retaining an attorney to manage the plan, and suggested George Snellings, III, of the Monroe, Louisiana law firm of Snellings, Breard, Sartor, Inabnett & Trascher (the "Firm"). The Jensens knew Snellings from his representation of Esther Jensen's family in the sale of the newspaper business, and in August 1977 they engaged him for tax planning and investment management assistance.
 
 
 3
 Acting on advice and assurances of income growth and safety by both Bradshaw and Snellings, the Jensens invested more than $2 million in cattle feeding programs. Snellings, on Esther Jensen's behalf, executed the cattle feeding agency agreement with Granada Financial Services on August 25, 1977. Thereafter, Snellings pooled the Jensens' cattle investments with those of the Ewings in a partnership denominated REM Company. For the following one and a half years, Snellings represented to the Jensens that he was performing the management services regarding the cattle feeding program in which they had invested, billing in excess of $100,000 for his fees and expenses.
 
 
 4
 In the spring of 1978, Snellings advised the Jensens to reduce their cattle investments and place a portion of their funds in oil and gas limited partnerships. He persuaded them to invest in excess of $300,000 in oil and gas drilling programs offered by a firm client, Frank Spooner.
 
 
 5
 Contrary to Snellings' periodic assurances, all did not go well with the Jensens' investments. On September 15, 1981, the Jensens filed suit in the United States District Court for the Eastern District of Louisiana against Snellings, the Firm, Bradshaw, E.F. Hutton, and Granada. Their complaint alleged violations of Sec. 17(a) of the Securities Act[1] and Sec. 10(b)[2] and Rule 10b-5[3] of the Securities Exchange Act; the Investment Advisers Act, 15 U.S.C. Sec. 80b-15; the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. Sec. 1962(c) & (d) (RICO); New York Stock Exchange Rule 405; the National Association of Securities Dealers' Rules of Fair Practice; and state blue sky laws, as well as state law breaches of contract and fiduciary duty.
 
 
 6
 In July 1982, the court, relying on its prior decision in Waterman S.S. Corp. v. Avondale Shipyards, Inc., 527 F.Supp. 256 (E.D.La.1981), dismissed the RICO claims for failure to state a claim, on the grounds that no connection with organized crime was alleged. After the Supreme Court rendered its opinion in Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985), in which the Court held that RICO does not require an organized crime nexus, the Jensens moved for reconsideration of the 1982 dismissal of their RICO claims. By minute entry on May 29, 1986, and in the final judgment dated March 26, 1987, the court reconsidered the RICO claims, but granted summary judgment and dismissed the claims on the basis of prescription, applying a two-year statute of limitations.
 
 
 7
 In February 1984, the court ruled that the federal securities claims were subject to Louisiana's two-year blue sky law prescriptive period, and ordered that discovery be conducted as to when prescription began to run on those claims. By minute entry on May 29, 1986, and final judgment dated March 26, 1987, the court granted summary judgment and dismissed the federal securities law claims as time-barred. In those orders, the court also dismissed without prejudice the pendent state law claims.[4]
 
 
 8
 Snellings and the Firm tendered the Jensens' complaint to their professional liability insurers, who denied coverage. Snellings and the Firm filed various third-party demands against their insurers, Appalachian Insurance Company, Imperial Casualty & Indemnity Company, and National Union Fire Insurance Company of Pittsburgh, Pennsylvania. Each of the insurers moved for summary judgment, which the trial court granted for Imperial and Appalachian on September 16, 1986, and for National Union on March 25, 1987, on the grounds that there was no coverage for the claims made by the Jensens and no duty to defend under the terms of the various policies. The March 26, 1987 final judgment dismissed the third party demands of Snellings and the Firm.
 
 
 9
 The Jensens appeal from the March 26, 1987 judgment dismissing their securities law, RICO, and pendent state law claims.[5] The Firm appeals the court's dismissal of its third party claims against all three insurers; Snellings appeals only the dismissal of his third party claims against Imperial and Appalachian.
 
 II. The RICO Claim
 
 10
 The district court, applying the two-year prescriptive period of the Louisiana Blue Sky Law, found in La.Rev.Stat.Ann. 51:714, determined that the statute of limitations period had expired for the bringing of the Jensens' RICO claims. The Supreme Court subsequently held that all civil RICO actions are governed by the four-year limitations period contained in the Clayton Act, 15 U.S.C. Sec. 15b. Agency Holding Corp. v. Malley-Duff & Assoc., Inc., --- U.S. ----, ----, 107 S.Ct. 2759, 2767, 97 L.Ed.2d 121 (1987). The defendants argue that the limitations period began to run in the spring of 1979. The Jensens' complaint was filed in September 1981. Therefore, even assuming the validity of the defendants' contention, the Jensens filed their RICO action within the four-year limitations period. While the defendants urge us to affirm the dismissal of the RICO claims on new grounds, specifically, for failure to properly plead, we decline to do so. The district court's grant of summary judgment and dismissal on the RICO claims are reversed and remanded.
 
 
 11
 III. The Applicable Limitations Period For The Federal Securities Claims
 
 
 12
 The Jensens' complaint alleged that the defendants carried out a fraudulent securities scheme involving a series of misrepresentations and omissions concerning, for instance, expected profits; actual losses; the services Hutton, Snellings, and Granada each provided; the necessity of retaining an attorney to manage the investments; and the furnishing of a prospectus. The complaint included claims under Sec. 17(a) of the Securities Act, Sec. 10(b) and Rule 10b-5 of the Securities Exchange Act, Sec. 215 of the Investment Advisers Act, New York Stock Exchange (NYSE) Rule 405, and the National Association of Securities Dealers (NASD) Rules of Fair Practice. Of these securities claims, the Jensens on appeal raise a limitations argument concerning only Sec. 10(b) and Rule 10b-5. Thus, the other federal securities claims raised below are deemed abandoned. See supra note 5, and cases cited therein.
 
 
 13
 Federal securities laws do not specify a limitations period for bringing suit under Sec. 10(b) or Rule 10b-5 of the Securities Exchange Act. Where federal law does not specify a limitations period, federal courts generally borrow the limitations period from the state statute which substantively most resembles the federal action. Agency Holding Corp., --- U.S. at ----, 107 S.Ct. at 2762; Wood v. Combustion Engineering, Inc., 643 F.2d 339, 342 (5th Cir.1981) (quoting McNeal v. Paine, Webber, Jackson & Curtis, Inc., 598 F.2d 888, 891 (5th Cir.1979)). Relying on a long line of cases from our court, the district court held that Louisiana's two-year Blue Sky prescriptive period, contained in La.Rev.Stat.Ann. 51:714, governed actions under Sec. 10(b) and Rule 10b-5. See Dupuy v. Dupuy, 551 F.2d 1005, 1023 n. 31 (5th Cir.), cert. denied, 434 U.S. 911, 98 S.Ct. 312, 54 L.Ed.2d 197 (1977); and Vigman v. Community Nat'l Bank & Trust Co., 635 F.2d 455, 459-60 (5th Cir.1981). See also Davis v. A.G. Edwards & Sons, Inc., 823 F.2d 105, 107 (5th Cir.1987).
 
 
 14
 We find no merit in the Jensens' arguments that La.Civ.Code Ann. art. 1847, which governs nullification of contracts from fraud, or Section 29 of the Federal Securities Exchange Act of 1934, 15 U.S.C. Sec. 78cc, regarding rescission of contracts, most closely resembles Sec. 10(b) and Rule 10b-5. Accordingly, we uphold the district court's determination that the two-year prescriptive period of Louisiana's Blue Sky Statute governs the Jensens' federal securities claims.
 
 IV. Running of The Prescriptive Period
 
 15
 The Jensens argue that the summary judgment dismissal of their federal securities law claims, on prescription grounds, was error because the record does not establish that prescription began to run more than two years before suit was brought. To prevail in their affirmative defense of prescription, the defendants had to show that, more than two years prior to bringing suit under Sec. 10(b) and Rule 10b-5, the plaintiffs had knowledge sufficient to begin the running of the limitations period. The Jensens contend that the evidence, when viewed in the light most favorable to them, is sufficient for a trier of fact to find for them on the issue, rendering summary judgment inappropriate.
 
 
 16
 Although we borrow the applicable limitations period from state law, the determination of when that limitations period begins to run is governed by federal law. Davis, 823 F.2d at 107. Under federal law, the limitations period commences when "the aggrieved party has either knowledge of the violation or notice of facts which, in the exercise of due diligence, would have led to actual knowledge" thereof. Id. (quoting Vigman, 635 F.2d at 459). Thus, the limitations period applicable to a cause of action for fraud, including one brought under Sec. 10(b) or Rule 10b-5, which proscribe the use of fraudulent or deceptive representations or practices in the sale of securities, does not begin to run until the plaintiff discovers, or in the exercise of reasonable diligence should discover, the alleged fraudulent conduct. Breen v. Centex Corp., 695 F.2d 907, 911 (5th Cir.1983). The requisite knowledge that a plaintiff must have to begin the running of the limitations period "is merely that of 'the facts forming the basis of his cause of action,' ... not that of the existence of the cause of action itself." Vigman, 635 F.2d at 459 (emphasis in original) (quoting Azalea Meats, Inc. v. Muscat, 386 F.2d 5, 9 (5th Cir.1967)).
 
 
 17
 The Jensens urge that where a defendant has acted affirmatively to conceal the fraud, we should apply a different rule. They would have us toll the limitations period until actual discovery, regardless of due diligence, by applying the principles expounded by the Seventh Circuit in Tomera v. Galt, 511 F.2d 504, 509-10 (7th Cir.1975). We decline to do so. We think the better reasoned rule is that an act of concealment should not relieve the plaintiff of his duty to exercise reasonable diligence to discover the fraud. See State of Ohio v. Peterson, Lowry, Rall, Barber & Ross, 651 F.2d 687, 694 (10th Cir.), cert. denied, 454 U.S. 895, 102 S.Ct. 392, 70 L.Ed.2d 209 (1981). Concealment by the defendant is only a factor to be considered in determining when the plaintiff should have discovered the fraud.
 
 
 18
 The requirement of diligent inquiry imposes an affirmative duty upon the potential plaintiff. Plaintiff is not permitted a "leisurely discovery of the full details of the alleged scheme." Klein v. Bower, 421 F.2d 338, 343 (2d Cir.1970). A plaintiff who has learned of facts which would cause a reasonable person to inquire further must proceed with a reasonable and diligent investigation, and is charged with the knowledge of all facts such an investigation would have disclosed. See In re Beef Indus. Antitrust Litig., 600 F.2d 1148, 1171 (5th Cir.1979); Armstrong v. McAlpin, 699 F.2d 79, 88 (2d Cir.1983). Investors are not free to ignore "storm warnings" which would alert a reasonable investor to the possibility of fraudulent statements or omissions in his securities transaction. Cook v. Avien, Inc., 573 F.2d 685, 697-98 (1st Cir.1978). Our emphasis on the duty of due diligence comports with the policy underlying statutes of limitation. They are intended to ensure fairness to defendants against "claims that have been allowed to slumber. ... the right to be free of stale claims in time comes to prevail over the right to prosecute them." Maxwell v. Swain, 833 F.2d 1177, 1178 (5th Cir.1987) (quoting Order of Telegraphers v. Railway Express Agency, Inc., 321 U.S. 342, 348, 64 S.Ct. 582, 586, 88 L.Ed. 788 (1944)).
 
 
 19
 Thus, the court must determine whether, by September 15, 1979, two years before suit was filed, the Jensens had either inquiry notice or actual notice of the alleged fraudulent conduct on the part of each of the defendants. Our review of the record leads us to determine the issue against the Jensens and to affirm the limitations bar against the securities claims as to each of the defendants.
 
 A. Defendants Snellings and the Firm
 
 20
 In their complaint, the Jensens base their securities claim against Snellings on numerous material misrepresentations and omissions made by him with the intent to defraud and to induce them to invest in certain programs, the fraud including, but not limited to: (1) the failure to reveal that he had no experience or knowledge in cattle investments; (2) the statement that the risks of the cattle investment program could be "fairly easily circumscribed"; (3) the statement that he was providing the primary daily management of the cattle investment program; (4) the failure to reveal that commissions to Hutton were increased by hedging through Hutton's Dallas office rather than through Granada; and (5) the failure to reveal the extent of the Jensens' losses.
 
 
 21
 The record shows that the Jensens' substantial losses in the cattle investment program, directly contrary to Snellings' on-going assurances of profits or, at most, minimal losses, were unquestionably apparent by the spring of 1979. Upon learning from Sam Gilmore, the banker for the cattle investment program, that they had not made their hedges, the Jensens repeatedly communicated with David Eller, Granada's president, in March and April 1979 concerning their investment. Eller told the Jensens that their losses were about $290,000. Sterling Jensen contacted feedyards and discovered that Snellings had not supervised the cattle feeding as claimed. He told Eller that Snellings had woven a "fairy tale" and "gouged" them, calling him a "scalawag" and wanting him disbarred. Viewed in their totality, these signs indicate that, as to defendant Snellings, and, indirectly, the Firm, the Jensens had at least the "storm warnings" that trigger the duty to inquire further and the running of the statute of limitations in the spring of 1979.
 
 
 22
 Even if this were not the case, information revealed to the Jensens in July 1979, more than two years before suit was filed, was surely sufficient to commence the limitations period. In April 1979, the Jensens sought an attorney to assist them in understanding their investment program, and, upon the recommendation of Eller, retained Walter Weathers of the Houston, Texas law firm of Sewell, Junell & Riggs. Weathers conducted an extensive investigation of the Jensens' investment program, focusing on Snellings' involvement. He wrote a thirty-five page memorandum concerning the Jensens' investment program, which was received by the Jensens in July 1979. In his memorandum, Weathers confirmed losses of over $300,000. He spoke of possible "secret profits" received by Snellings from Bradshaw and Granada, misrepresentations by Snellings as to losses, unjustifiable management fees charged by Snellings, and statements by Snellings that he was a "complete novice" in the area of cattle investments. Weathers wrote that the Jensens might have "a cause of action against Snellings," and referred to "claims" and "recovery."
 
 
 23
 The Jensens undoubtedly understood that the facts revealed in the memorandum might support a suit against Snellings, because their July 1979 letter to Ellers declared that facts known to them "could build a case," and referred to Weathers' first memorandum as containing "material for consumption by a jury." On the Jensens' copy of the Weathers' memorandum, Esther Jensen wrote, next to the account of Snellings' own description of his activities, the words "con job," "hoax," "absurd," and "sheer fabrication." Indeed, Weathers' memorandum provided not merely "storm warnings," but nearly all the facts on which the Jensens' federal securities claims against Snellings and the Firm were subsequently brought.
 
 
 24
 When these facts came to the Jensens' attention, they had a duty to exercise reasonable diligence to ferret out the truth and timely bring their claim. We find ample evidence that they did not do so. In a cover letter to a mid-October 1979 memorandum discussing Snellings' misconduct, Weathers advised the Jensens to obtain independent legal counsel concerning the case, including Hutton's and Granada's involvement in their investments. That same month, the Jensens contacted a Louisiana attorney, Martin Feldman, who told them they had a possible malpractice claim against Snellings. Due to a conflict of interest, he declined the case and referred them to attorney Harry Zimmerman, whom they contacted in late November 1979. Zimmerman, upon reviewing the Jensens' materials to date, told them they had a possible federal securities action against Snellings and the Firm, as well as Bradshaw, Hutton and Granada. Subsequently, after more than a year of no activity by Zimmerman, the Jensens reclaimed their materials. They sought the advice of the Washington, D.C. law firm of Steptoe & Johnson in August or September 1981. Suit was finally brought in mid-September.
 
 
 25
 We cannot accept the Jensens' argument that they were "unsophisticated," "unknowlegeable," and "befuddled," and that they therefore did not understand that there was wrongdoing from the information they had by July 1979. The standard for whether facts sufficient to commence the limitations period would have been discovered upon reasonable inquiry is an objective one. Koke v. Stifel, Nicolaus & Co., Inc., 620 F.2d 1340, 1343 (8th Cir.1980) (the proper inquiry is "[w]hat facts would alert a reasonable person to the possibility of wrongdoing?" (emphasis added)). A reasonable person would have been alerted to a possible fraudulent scheme on the part of Snellings at least upon receipt of Weathers' memo in July 1979, and more likely by the spring of that year.
 
 
 26
 Similarly, we reject Jensens' contention that the limitations period did not begin to run until Zimmerman, in November of 1979, told them they had a possible securities claim. The requisite knowledge, actual or constructive, needed to begin the running of the prescriptive period is merely that of the underlying facts, not that of the legal cause of action itself. Vigman, 635 F.2d at 459. Zimmerman merely reviewed the Jensens' materials and based his assessment on the very facts already available to them.
 
 
 27
 The district court was correct in holding that the Jensens' federal securities claims against Snellings and the Firm were time-barred.
 
 B. Defendants Bradshaw and Hutton
 
 28
 The Jensens' federal securities claims against broker Bradshaw and his employer, Hutton, are also time-barred. In their complaint, the Jensens fault Bradshaw and Hutton for fraudulently inducing them into investing in the cattle feeding investment programs through the use of many material misrepresentations and omissions, among them being: (1) the statement that Bradshaw would closely supervise the cattle feeding investments; (2) the failure to reveal that Hutton had underwritten the Granada cattle feeding program offering to ensure that Granada would be capable of paying for a feedlot purchased from Hutton; (3) the statement that the Jensens would make a million dollars and "be drinking champagne in three years"; (4) the failure to reveal that Granada would perform the marketing and management functions of the program; (5) the failure to deliver to the Jensens the private placement memorandum of Granada's offering; and (6) the failure to reveal that Hutton would receive one dollar out of every five-dollar management fee paid by the Jensens to Granada.
 
 
 29
 Despite his assurance that he would closely supervise their investment program, by March 1979 Bradshaw had not contacted the Jensens for two years. At that time, upon learning from Eller of substantial losses in Granada's cattle feeding program, Esther Jensen called Bradshaw, who insisted that the Jensens had made a profit. She felt that Bradshaw was "very menacing" during their discussion. In an April 4, 1979 letter to Eller, Sterling Jensen criticized Bradshaw for praising Snellings' efforts, saying that Bradshaw was continuing "the myth that George [Snellings] was working his ass off on our behalf." He also noted that Bradshaw should have told them of their losses, but did not. Thus, it appears that by spring 1979 the Jensens had knowledge of sufficient inconsistencies concerning Bradshaw and Hutton to trigger a duty to inquire further.
 
 
 30
 Even if these signs of notice were insufficient to trigger a duty to investigate Bradshaw and Hutton, information contained in Weathers' first memorandum, in July 1979, clearly constituted sufficient notice. Weathers wrote that there were possible secret profits paid by Hutton to Snellings; that the Jensens were suspicious that Bradshaw had received payments from Snellings for referring the Jensens to him; that Bradshaw had misrepresented who was to perform the management of the cattle feeding programs; that Hutton had underwritten Granada's offering in an effort to ensure payment on a feedlot sold by Hutton to Granada; that Hutton received one dollar out of every five-dollar management fee collected by Granada; and that Bradshaw collected nonessential brokerage commissions by having the hedging done through his office in Dallas rather than through Granada, at double the cost to the Jensens. In his memorandum, Weathers advised that these extra brokerage commissions "should be explored." This memorandum clearly provided them with sufficient storm warnings to alert a reasonable person to the possibility that there were material misrepresentations or omissions on the part of Bradshaw and Hutton in their investment transactions.
 
 
 31
 Contrary to their contention on appeal, the evidence shows that the Jensens were aware from the outset that attorney Weathers was not investigating Bradshaw, Hutton or Granada. Indeed, after Weathers' first memorandum, the Jensens did themselves initiate an inquiry regarding Bradshaw and Hutton, and questioned Eller regarding the extra brokerage commissions. The inquiry, however, did not proceed with reasonable diligence.
 
 
 32
 We find no merit in the Jensens' contention that the information they had by July 1979 was insufficient to trigger the limitations period because they did not know whether it was true. They did have knowledge of facts sufficient to excite further inquiry in a reasonable person, which, if pursued, would have disclosed the fraud.[6] We concur in the district court's ruling that the statute of limitations had run on the Jensens' federal securities claims against Bradshaw and Hutton.
 
 C. Defendant Granada
 
 33
 In their complaint, the Jensens assert that Granada failed to properly supervise Snellings or Bradshaw or to notify the Jensens upon learning of Snellings' misconduct, rendering Granada secondarily liable through their status as "controlling persons" under Sec. 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78t.[7] Additionally, they claim Granada is primarily liable for failure to deliver a private placement memorandum to the Jensens.
 
 
 34
 A review of the record reveals that the Jensens had sufficient facts by July 1979 to cause a reasonable person to inquire further as to any wrongdoing or responsibility of Granada. The Jensens were concerned that Eller, Granada's President, "never gave them the same figure twice" as to the amount of their losses. In March 1979, Mildred Ewing told her daughter, Esther Jensen, that she thought that Granada had stolen $70,00 each from her, the Jensens, and Robert Ewing. In his first memorandum, received by the Jensens in July 1979, Weathers disclosed the "secret" relationship between Granada and Hutton.
 
 
 35
 Moreover, the limitations period ran notwithstanding the secondary nature of Granada's liability for the misconduct of Bradshaw and Snellings. If they had diligently investigated their claim against Bradshaw and Snellings, they would have also learned of Granada's secondary liability within the requisite limitations period. Indeed, as with the other defendants, it appears that the facts and knowledge concerning Granada gathered by the Jensens by July 1979 formed not only the basis of Zimmerman's conclusion that they had a possible securities fraud case against all the defendants herein, but also the basis of the complaint filed on their behalf nearly two years later. Additionally, the Jensens charge Granada with failure to furnish a private placement memorandum. They certainly knew all along that one had never been delivered to them.
 
 
 36
 Accordingly, we conclude that the record contains ample evidence to prove that the Jensens' federal securities law claims were barred by the statute of limitations as to all defendants.
 
 V. The Insurers' Liability
 
 37
 The district court granted summary judgment for the three professional liability insurers, Imperial, Appalachian, and National Union, and dismissed Snellings' and the Firm's (the "Insureds") third party demands against them. It held that the insurers owed the Insureds neither a duty to defend nor any coverage under the professional liability insurance policies on four grounds: (1) that the services provided by Snellings to the Jensens were not professional legal services; (2) that the claims were time-barred; (3) that the alleged wrongful acts and omissions were specifically excluded by the policy; and (4) that certain requirements of individual policies as to the timing of the acts or the making of the claims were not met. We will consider each of these grounds in turn, and affirm the judgment only if we are convinced that Snellings or the Firm failed to establish a need for trial on the issues of policy coverage or the insurers' duty to defend. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).
 
 A. The scope of professional services
 
 38
 The policies afforded protection against liability in connection with professional services offered by Snellings (or the Firm) in his capacity as a lawyer. The pertinent provisions of the policies are substantively the same, and provide:
 
 INSURING AGREEMENTS
 1. COVERAGE A--Individual Coverage
 
 39
 To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of any act or omission of the insured, or of any other person for whose acts or omissions the insured is legally responsible, and arising out of the performance of professional services for others in the insured's capacity as a lawyer....
 
 COVERAGE B--Partnership Coverage
 
 40
 To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of any act or omission of the insured, or of any other person for whose acts or omissions the insured is legally responsible, and arising out of the performance of professional services for others in the insured's capacity as a lawyer provided one or more claims arising out of the same professional service are made (1) jointly or severally against two or more members of the partnership insured hereunder or against any member and such partnership, (2) against the partnership or (3) against the insured solely because he is a member of the partnership insured hereunder.
 
 
 41
 ....
 
 
 42
 II. DEFENSE, SETTLEMENT, SUPPLEMENTARY PAYMENTS
 
 
 43
 With respect to such insurance as is afforded by this policy, the company shall:
 
 
 44
 (a) defend any suit against the insured alleging such act or omission and seeking damages which are payable under the terms of this policy, even if any of the allegations of the suit are groundless, false or fraudulent; but the company may make such investigation and, with the written consent of the insured, such settlement of any claim or suit as it deems expedient;
 
 
 45
 ....
 
 IV. FIDUCIARY COVERAGE
 
 46
 When the insured acts as an administrator, conservator, executor, guardian, trustee, or in any similar fiduciary capacity, his acts and omissions in such capacity shall be deemed for the purpose of Insuring Agreement I to be the performance of professional services for others in the insured's capacity as a lawyer, but only to the extent that such acts and omissions are those for which in the usual attorney-client relationship the insured would be legally responsible as attorney for a fiduciary.[8]
 
 
 47
 In Louisiana, and generally in all jurisdictions, an insurer's duty to defend its insured is broader than its liability for a judgment against him. Donnelly v. Transp. Ins. Co., 589 F.2d 761, 765 (4th Cir.1978), and cases cited therein; Meloy v. Conoco, Inc., 504 So.2d 833, 838 (La.1987). This general rule comports with policy considerations which would preclude the denial of a defense to a person accused but not yet found guilty, but would not impede the denial of coverage to a person determined at trial to have been acting outside the scope of the policy. Donnelly, 589 F.2d at 765. Thus, we address separately the issues of the insurers' duty to defend this suit and the insurers' liability for a prospective judgment against the Insureds.
 
 
 48
 It is well-settled in Louisiana that an insurer's duty to defend suits filed against its insured is determined by a comparison of the allegations of the plaintiff's complaint and the terms of the policy, with the insurer having a duty to defend unless the allegations in the complaint unambiguously exclude coverage. Vaughner v. Pulito, 804 F.2d 873, 876-77 (5th Cir.1986) (applying Louisiana law); Meloy, 504 So.2d at 839; American Home Assurance Co. v. Czarniecki, 255 La. 251, 230 So.2d 253, 259 (1969). The duty to defend is determined solely from the plaintiff's pleadings and the face of the policy, without consideration of extraneous evidence. See Collier v. Williams-McWilliams Co., Inc., 459 So.2d 719, 724 (La.App.4th Cir.1984). Where the pleadings, taken as true, allege both coverage under the policy and liability of the insured, the insurer is obligated to defend, regardless of the outcome of the suit or the eventual determination of actual coverage. American Home, 230 So.2d at 259; Hanover Ins. Co. v. Highlands Ins. Co., 511 So.2d 1296, 1297 (La.App.2d Cir.1987). Further, the allegations in the complaint are liberally interpreted to determine whether they establish the insurer's duty to defend. Id. Under Louisiana law, "the rights of the insured are deemed paramount." Travelers Ins. Co. v. Guidry, 444 So.2d 191, 192 (La.App.1st Cir.1983). It is only the factual allegations which are considered, however; statements of conclusions in the complaint that are unsupported by factual allegations will not trigger a duty to defend. Guidry v. Zeringue, 379 So.2d 813, 816 (La.App.4th Cir.1980).
 
 
 49
 Thus, the insurer is obligated to defend if the complaint discloses even a possibility of liability under the policy. See Vaughner, 804 F.2d at 877. Even though the main thrust of a complaint falls outside policy coverage, all factual allegations are considered in determining the duty to defend, and if there are any facts which, when taken as true, support a claim for which coverage is not unambiguously excluded, then the duty to defend arises. See Armstrong v. Land & Marine Applicators, Inc., 463 So.2d 1327, 1331 (La.App.5th Cir.1984); American Auto. Ass'n, Inc. v. Globe Indem. Co., 362 So.2d 1206, 1209 (La.App.4th Cir.1978). Consequently, allegations which support at least one cause of action within policy coverage obligate the insurer to defend. Additionally, Louisiana law dictates that where ambiguity exists as to the coverage intended by the terms of an insurance policy or warranted by the pleadings, the policy is construed against the insurer. ADA Resources, Inc. v. Don Chamblin & Assoc., 361 So.2d 1339, 1343 (La.App.3d Cir.1978).
 
 
 50
 Armed with these principles, we examine whether the district court properly found that Snellings did not perform professional legal services for the Jensens. Under the policies, the Insureds were protected against damages because of any act or omission "arising out of the performance of professional services for others in the insured's capacity as a lawyer." If any of the charges made in the Jensens' complaint, taken as true, could possibly state a claim within the above-stated policy coverage, then, barring an applicable exception, the insurers owed a duty to defend all the charges.
 
 
 51
 The district court evaluated the allegations in the Jensens' complaint and concluded that they asserted claims of misconduct in Snellings' performance as the Jensens' investment advisor or manager, not as their lawyer. In reaching its decision, the court relied on the fact that La.Rev.Stat.Ann. Sec. 37:212, captioned " 'Practice of law' defined,"[9] does not include financial management or advisory acts. However, the court's reliance on this section is misplaced. Section 37:212 is to be read in conjunction with La.Rev.Stat.Ann. 37:213, captioned "Persons, professional associations and professional corporations entitled to practice law; penalty for unlawful practice." Together, they do not limit the services a lawyer can provide in his professional capacity, but, rather, set forth those services that only a lawyer can provide. We endorse the definition of professional services promulgated by a Louisiana court years ago, and cited by the district court below: "professional services" have been defined as "services performed by one in the ordinary course of the practice of [one's] profession, on behalf of another." Aker v. Sabatier, 200 So.2d 94, 97 (La.App. 1st Cir.1967). The coverage of "professional services" rendered "in the insured's capacity as a lawyer" is broader than the services delineated in 37:212. It includes all the services routinely rendered for others by an attorney in a legal practice of his type.
 
 
 52
 While it is true that the complaint focuses on Snellings' acts as an investment advisor or manager, we are compelled to consider all of the allegations in determining an insurer's duty to defend. See American Auto. Ass'n, 362 So.2d at 1209. According to the complaint, the Jensens retained Snellings as an attorney and investment adviser because Bradshaw told them they had to have "an attorney like Snellings" to manage their investment. The Jensens sought and obtained advice from Snellings regarding minimizing their tax liability. Snellings, a tax attorney, advised them regarding tax savings and tax write-off figures. Further, he induced them to invest in the Spooner oil and gas drilling programs as a means of minimizing their tax liability. The complaint alleges that the false tax information and advice given by Snellings was a cause of the losses for which recovery is sought.
 
 
 53
 The insurers rely on La.Rev.Stat. 37:212, distinguished earlier, and Smith v. Travelers Indem. Co., 343 F.Supp. 605 (M.D.N.C.1972), as supporting their contention that they were relieved of any duty to defend because Snellings' activities on behalf of the Jensens were not within the scope of professional legal services. Smith held that the defendant lawyer who invested money for the plaintiff was not acting in any legal capacity, and thus his insurer owed no duty to defend. Id. at 610. However, the court in Smith emphasized that neither the attorney nor the client viewed their relationship as that of attorney-client, and that no legal skill or training was utilized. In the instant case, the complaint indicates that the Jensens retained Snellings as an attorney, and that the services he rendered to the Jensens included ones that employed his knowledge and training as a tax attorney.
 
 
 54
 In Bancroft v. Indem. Ins. Co. of North America, 203 F.Supp. 49 (W.D.La.), aff'd, 309 F.2d 959 (5th Cir.1962), the court viewed the area of tax consequences as "a mixed area of accounting and law, a twilight zone where both professions find common ground and, in some instances at least, are equally competent to render expert advice." Id. at 56. The court therefore found that the plaintiff's certified public accountant liability insurance policy covered the plaintiff accountant's rendering of an opinion on the tax consequences of an investment transaction. In so ruling, the court found it significant that the insurer should have known that such opinions are routinely rendered by accountants in the performance of professional services, and could have expressly excluded such advice from policy coverage.
 
 
 55
 Similarly, tax attorneys routinely advise their clients on the tax consequences of investment transactions in the regular performance of their professional services. With this in mind, we are of the opinion that at the very least the allegations of Snellings' rendering tax advice do not "unambiguously exclude coverage." American Home, 230 So.2d at 259. Resolving any doubt in favor of the Insureds, we conclude that some of the acts and omissions with which Snellings is charged arose "out of the performance of professional services for others in the insured's capacity as a lawyer."[10]
 
 B. The claims as time-barred
 
 56
 The insurers argue, and the district court held, that the Jensens did not allege a claim within the policies' terms because their causes of action had prescribed. This argument is without merit. Louisiana law looks to the allegations in the pleadings, accepted as true, to determine the duty to defend. American Home, 230 So.2d at 259. Indeed, the policies themselves expressly stipulate that the duty to defend exists "even if any of the allegations of the suit are groundless, false or fraudulent." As we said in a recent case interpreting similar Texas law, "the proper question is not what could [the Jensens] successfully have pled, but what did [the Jensens] in fact plead." Brooks, Tarlton, Gilbert, Douglas & Kressler v. U.S. Fire Ins. Co., 832 F.2d 1358, 1368 (5th Cir.1987). The Jensens' pleadings themselves, taken as true, do not state facts that foreclose the bringing of the claims.
 
 C. The policy exclusions
 
 57
 The professional liability insurance policies at issue each contained an exclusion for any dishonest, fraudulent, criminal or malicious act or omission of any insured, partner, or employee. The district court found that the Jensens' complaint alleged that Snellings "was fraudulent or grossly dishonest," thus negating coverage or a duty to defend either Snellings or the Firm under the policies. The insurers argue that the exclusion is proper as to the Firm because the fraudulent conduct of Snellings is imputed to the partnership. See McCaskill v. Welch, 463 So.2d 942, 949 (La.App.3d Cir.1985). In this appeal, we must decide whether the pleadings raise any claim against Snellings and/or the Firm that does not fall under the exclusion provision, thus necessitating a defense of the suit by the insurers.
 
 
 58
 In its September 17, 1986 order granting summary judgment for Imperial and Appalachian, the court stated, "[a] complete reading of the plaintiffs' complaint leads to only one conclusion: the plaintiffs allege the defendant was fraudulent or grossly dishonest." In so writing, the district judge parallels our courts' language in Battisti v. Continental Casualty Co., 406 F.2d 1318 (5th Cir.1969), in which we held that an attorney's liability insurance carrier was not required to defend a suit against the attorney under an exclusion similar to the one in the instant case. Id. at 1321. While Battisti resembles the case at hand, it is distinguishable. Battisti was the attorney and long-time close friend of a wealthy couple, the Staples. When the Staples sought a divorce, Battisti advised both sides, structuring a generous property settlement for Mrs. Staples, which included a will in which her entire estate would pass to Mr. Staples. Battisti did not advise Mr. Staples that the divorce would void the will under state law. A few days after the divorce, Battisti prepared a new will, which the ex-Mrs. Staples executed, in which Battisti was made the executor and his wife a major beneficiary. When the ex-Mrs. Staples died two weeks later, an apparent suicide, Mr. Staples sued to rescind the documents and for damages against Battisti. Battisti's professional liability insurer refused to defend the suit, and our court ultimately agreed that the complaint alleged only conduct within the exclusion clause for fraud or dishonesty, not mere negligence.
 
 
 59
 While the alleged acts in Battisti, if true, were all clearly fraudulent, dishonest or criminal, the same cannot be said for the allegations in the instant case. The Jensens' allegations raise claims of fraud and dishonest behavior on the part of Snellings, but they raise additional claims as well. In analyzing the pleadings, we are mindful of the Louisiana courts' instructions to liberally construe the allegations in the pleadings, American Home, 230 So.2d at 259, considering all the allegations and resolving any ambiguity in favor of finding a duty to defend, American Auto. Ass'n, 362 So.2d at 1209. Strict construction against the insurer is especially appropriate when interpreting exclusionary clauses in insurance policies. Borden, Inc. v. Howard Trucking Co., Inc., 454 So.2d 1081, 1090 (La.1983).
 
 
 60
 In addition to fraud and dishonesty, the Jensens' complaint also alleges, against Snellings and the Firm separately, claims that do not rise to the level of fraud, and are thus outside the policy exclusion. See Brooks, Tarlton, 832 F.2d at 1367-70. The Firm's failure to supervise Snellings could have been negligence or breach of contract. Snellings' or the Firm's failure to provide a prospectus could have been an act of negligence. Indeed, many of the misdeeds complained of could have negligently occurred, without the wrongful, fraudulent intent alleged in the complaint: faulty tax advice, incorrect figures on the profitability of the investments, Snellings' representations about the quality of the Spooner oil and gas drilling programs, and Snellings' failure to reveal his inexperience in cattle investments, for instance. Although the Jensens allege fraudulent and dishonest acts by Snellings, on the face of the pleadings it is possible for them to recover under their complaint by proof of improper but nonfraudulent conduct on the part of Snellings and/or the Firm. Consequently, we conclude that since not all of their allegations clearly fall within the exclusion provision, the complaint does not "unambiguously exclude coverage." American Home, 230 So.2d at 259. In so ruling, we note that this finding comports with Louisiana law construing the duty to defend broadly, since, when a suit is filed against an insured, he has been merely accused, not tried and found guilty.
 
 
 61
 D. The timing of the occurrence/filing of the claim
 
 
 62
 Having found that the Jensens' complaint raised claims within the scope of the insurers' duty to defend under the policies that were not relieved by any exclusion provision, we must lastly consider the arguments of the various insurers that the occurrences did not happen, or that the claims were not properly raised, within the policies' terms. We will consider each insurer in turn.
 
 1. The Imperial policies
 
 63
 Imperial issued two annual policies to the Firm, which covered the Firm and Snellings from October 1, 1978 to October 1, 1980 on a "claims-made basis." Specifically, the policies applied only to negligent acts, errors, omissions or offenses which occurred (1) during the policy period if the claim was first made during the policy period, or (2) prior to the effective date of the policy if the claim was first made during the policy period and no insured, at the effective date of the policy, "had knowledge or could have reasonably foreseen any circumstances" which might have resulted in a claim.
 
 
 64
 The trial court expressly found that the Jensens' claim was not filed until September 15, 1981, the day suit was filed, and almost a year after the Imperial policy had lapsed. At issue on appeal is whether a claim was made during the policy period, October 1, 1978 to October 1, 1980. The parties disagree on the expansiveness with which the word "claim" is to be interpreted.
 
 
 65
 Under Louisiana law, words in an insurance policy "are to be understood in their common and usual significance," focusing on "general and popular use." Hebert v. First Am. Ins. Co., 461 So.2d 1141, 1143 (La.App.5th Cir.1984). Webster's New World Dictionary defines "claim" as "a demand for something rightfully or allegedly due." Webster's New World Dictionary 262 (2d college ed. 1986). Similarly, "claim" is defined elsewhere as "a demand of a right or a supposed right ... a calling on another for something due or supposed to be due." Webster's Third New International Dictionary 414 (3d ed. unabridged 1968).
 
 
 66
 Both Imperial and the Insureds agree that under the policy, the making of a claim can be something less than the filing of a lawsuit. Indeed, Condition I(c) of the policy provides that "in the event claim is made or suit is brought against the insured, the insured shall immediately forward to the company every demand, notice, summons or other process received by him or his representative." (emphasis added).
 
 
 67
 Read together, the notice of claim clause and the "if claim is made" clause in the Imperial policy unambiguously indicate that the "claim" contemplated therein is in the nature of an actual demand for something on the ground of a right. See Hoyt v. St. Paul Fire & Marine Ins. Co., 607 F.2d 864, 867 (9th Cir.1979). The court in Hoyt, construing provisions in a professional liability insurance policy that were identical to the provisions at issue here, applied a similar interpretation and concluded that a letter received by the insured attorney within the policy period did not rise to the level of a claim. The letter questioned the advisability of a will provision drafted by the attorney and requested an explanation. The Hoyt court reasoned that "an inquiry cannot be transformed into a claim or demand depending in each case on the reasonable expectations of the insured--whether he should reasonably have been satisfied that the explanation would be accepted as justification for the questioned conduct or should reasonably have expected that it would not. Such a rule would firmly write uncertainty of coverage into every policy." Id. at 866.
 
 
 68
 Aside from the fact that no notice of claim was given to Imperial during the 1978-1980 coverage period, the record presents no issue of the Jensens making a claim to the Insureds during that period. Snellings alleges that he was presented with a claim in a telephone conversation with the Jensens, their attorneys, and representatives of the Securities Exchange Commission, as corroborated by the affidavit of Martin Feldman. The Firm admits to no knowledge of this alleged claim prior to the filing of suit in September 1981, but urges us to find summary judgment for the insurer inappropriate because a trier of fact could reasonably find that these expressions to Snellings constituted a claim.
 
 
 69
 While Snellings did state in his answers to interrogatories that in the summer of 1979 he anticipated the filing of a lawsuit by the Jensens, he subsequently stated in his deposition that the response had been prepared by his counsel and was incomplete. Snellings presents no evidence that an actual claim or demand had been made upon him. To the contrary, the evidence shows that prior to the filing of the actual suit, Snellings "had no apprehension about a lawsuit being filed whatsoever." In the telephone call from the representatives of the Securities Exchange Commission, Snellings was told "you'll never hear from us again." Similarly, in separate telephone conversations with attorney Weathers and a New Orleans attorney, Snellings was told that the Jensens had no grounds for a claim and that they would be advised accordingly. The affidavit of Martin Feldman is inapposite to this issue as it makes no mention of any communication with Snellings or the Firm by anyone on any matter.
 
 
 70
 The evidence submitted by the Insureds about whether a claim was made during the period in which the Imperial policy was in force is insufficient to raise a triable issue; a mere scintilla of evidence does not suffice. See Professional Mgrs. v. Fawer, Brian, Hardy & Zatzkis, 799 F.2d 218, 223 (5th Cir.1986). The record is devoid of evidence upon which a factfinder could reasonably find for the Insureds on this issue. See Anderson, 477 U.S. at 255-56, 106 S.Ct. at 2514. Accordingly, we conclude that the district court was correct in dismissing Snellings' and the Firm's third party claims against Imperial.
 
 2. The Appalachian policy
 
 71
 Appalachian issued a policy which covered the Firm and Snellings from March 8, 1974 to October 1, 1977 on an "occurrence basis." Thus, the policy covered claims for damages resulting from acts or omissions that occurred during the policy period. Appalachian does not counter the Insureds' contention that the Jensens' complaint alleges losses resulting from numerous acts and omissions of Snellings that occurred within the policy period. Since the Jensens' complaint asserted claims resulting from misconduct beginning in the summer of 1977, the alleged claims clearly fall within the policy period.
 
 3. The National Union policy
 
 72
 The Firm and Snellings were covered on a "claims-made basis" by a policy issued by National Union for the period from October 1, 1980 to October 1, 1981. Specifically, the policy covered only claims first made against the Insured and reported to the insurer during the policy period, with claims arising from acts or omissions occurring prior to the policy period excluded if any insured knew or should have known at the effective date of the policy that such acts or omissions might be expected to result in a claim.
 
 
 73
 When informed of the Jensens' complaint against the Insureds, National Union provided a defense to the suit, reserving the right to deny coverage. In his March 26, 1987, judgment, the district judge ruled that the National Union policy afforded the Insureds neither coverage nor a defense to the Jensens' suit. Only the Firm, not Snellings individually, appeals the district court's dismissal of National Union from this action. Thus, we consider Snellings' claim against National Union to be abandoned. See supra note 5.
 
 
 74
 Clearly, there was a duty to defend the Firm based on a reading of the complaint and the National Union policy. The Jensens' complaint alleged claims arising from misconduct occurring as early as 1977, prior to the effective date of the policy. While the policy provides that claims arising from acts or omissions occurring prior to the policy period are subject to exclusion, they are excluded only if the insured knew or should have known at the effective date of the policy both of the wrongful conduct and that it might be expected to result in a claim. Further, the policy contained a separate clause which provided for coverage for insureds who did not participate or knowingly acquiesce in the excluded conduct of a co-insured.[11] Even assuming that Snellings knew or should have known at the policy's effective date of his misconduct and that it might likely result in a claim, his knowledge cannot be imputed to the Firm. Nothing in the record indicates such knowledge on the part of the Firm. The Jensens' claim against the Firm was first made in September 1981, during the policy period. Consequently, a duty to defend the Firm arose under the National Union policy.
 
 
 75
 We conclude that the Jensens' claims against Snellings and the Firm invoke neither a duty to defend nor any liability under the policy issued by Imperial. We do hold, however, that Appalachian had a duty to defend Snellings and the Firm in the suit brought by the Jensens, and that National Union had a duty to defend only the Firm in the same proceedings. We therefore reverse the district court's grant of Appalachian's motion for summary judgment and grant summary judgment in favor of Snellings and the Firm on Appalachian's duty to defend. Similarly, we reverse the district court's grant of summary judgment in favor of National Union against the Firm, and grant summary judgment in favor of the Firm on National Union's duty to defend. In an appropriate case, we can grant summary judgment for the nonmoving party even though he made no formal cross-motion under Rule 56. 10A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure: Civil 2d Sec. 2720 (1983); E.C. Ernst, Inc. v. Gen. Motors Corp., 537 F.2d 105, 109 (5th Cir.1976); Voitier v. First Nat'l Bank of Commerce, 514 F.Supp. 585, 594 (E.D.La.1981). The facts dispositive of this issue were presented and argued at length to the district court, and the movant insurers had a full and fair opportunity to develop the record as to their duty to defend. In view of our disposition on the issue, the Insureds are entitled to summary judgment as to the insurers' duty to defend, as stipulated above.
 
 
 76
 The circumstances are not the same, however, as to the district court's grant of summary judgment in favor of the insurers on the issue of policy coverage of any prospective judgment against Snellings or the Firm. Since no money judgment yet exists and all claims were dismissed on summary judgment by the district court, the parties have not had a full and fair opportunity to present and argue the facts regarding policy coverage of any eventual awards. Since policy coverage and the duty to defend are not coextensive, our ruling on the duty to defend is not dispositive on the issue of policy coverage.
 
 VI. Conclusion
 
 77
 Accordingly, the decision of the district court is affirmed as to the dismissal of the Jensens' federal securities claims, and reversed and the cause remanded as to the Jensens' RICO action. Further, the district court's dismissal on summary judgment of all claims against Imperial and of Snellings' claims against National Union is affirmed. On the issue of the duty to defend the Firm, the decision of the district court granting Appalachian and National Union summary judgment is reversed, and summary judgment is granted in favor of the Firm. On the issue of the duty to defend Snellings, the district court's grant of summary judgment for Appalachian is reversed, and summary judgment is granted in favor of Snellings. The claims of policy coverage of Snellings and the Firm by Appalachian and policy coverage of the Firm by National Union remain in the case as remanded.
 
 
 78
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
 
 
 
 *
 Unpublished opinion. See U.S. Ct. of App. 5th Cir. Rule 47.5, 28 U.S.C.A
 
 
 [1]
 Federal Securities Act of 1933, Sec. 17(a), 15 U.S.C. Sec. 77q (captioned "Fraudulent interstate transactions")
 
 
 [2]
 Federal Securities Exchange Act of 1934, Sec. 10(b), 15 U.S.C. Sec. 78(j) (captioned "Manipulative and deceptive devices")
 
 
 [3]
 17 C.F.R. Sec. 240.10b-5 (captioned "Employment of manipulative and deceptive devices")
 
 
 [4]
 The claims against Snellings and the Firm for legal malpractice were dismissed earlier by order dated April 10, 1985, on the basis of Louisiana's one-year prescriptive period for tort claims. In the 1985 order summary judgment was expressly denied as to any management or advisory services that may have been rendered to the Jensens
 
 
 [5]
 The Jensens do not raise the pendent state law claims in their argument in their brief on appeal. Thus, we consider the state law claims abandoned. See Fed.R.App.P. 28(a)(4); In re Tex. Mortg. Services Corp., 761 F.2d 1068, 1073-74 (5th Cir.1985); Smith v. State Farm Fire and Cas. Co., 695 F.2d 202, 206 (5th Cir.1983)
 
 
 [6]
 The Jensens misperceive the nature of the facts upon which knowledge is based for the purpose of commencing the limitations period. As one judge wrote:
 What on the one hand is tantamount to an actual discovery of fraud should not be confused with what on the other carries a duty to investigate. It is impossible to lay down any general rule as to the amount of evidence or number or nature of evidential facts admitting discovery of fraud. But, facts in the sense of indisputable proof or any proof at all, are different from facts calculated to excite inquiry which impose a duty of reasonable diligence and which, if pursued, would disclose the fraud. Facts in the latter sense merely constitute objects of direct experience and, as such, may comprise rumors or vague charges if of sufficient substance to arouse suspicion. Thus, the duty of reasonable diligence is an obligation imposed by law solely under the peculiar circumstances of each case, including existence of a fiduciary relationship, concealment of the fraud, opportunity to detect it, position in the industry, sophistication and expertise in the financial community, and knowledge of related proceedings.
 Tobacco & Allied Stocks v. Transamerica Corp., 143 F.Supp. 323, 331 (D.Del.1956), aff'd, 244 F.2d 902 (3d Cir.1957).
 
 
 [7]
 Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78t, states:
 (a) Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.
 
 
 [8]
 The quoted provisions are taken from the policy issued by Appalachian. While Imperial's and National Union's policies do not contain separate provisions for partnership coverage, the same effect was achieved by the fact that, in addition to the individual lawyers in the Firm, the Firm itself was covered as an insured
 
 
 [9]
 Section 37:212 provides:
 The practice of law is defined as follows:
 (1) In a representative capacity, the appearance as an advocate, or the drawing of papers, pleadings or documents, or the performance of any act, in connection with proceedings, pending or prospective, before any court of record in this state; or
 (2) For a consideration, reward, or pecuniary benefit, present or anticipated, direct or indirect,
 (a) the advising or counseling of another as to secular law, or
 (b) in behalf of another, the drawing or procuring, or the assisting in the drawing or procuring of a paper, document, or instrument affecting or relating to secular rights, or
 (c) the doing of any act, in behalf of another, tending to obtain or secure for the other the prevention or the redress of a wrong or the enforcement or establishment of a right.
 Nothing in this Section prohibits any person from attending to and caring for his own business, claims, or demands; nor from preparing abstracts of title, or certifying, guaranteeing, or insuring titles to property, movable or immovable, or an interest therein, or a privilege and encumbrance thereon; or from performing, as a notary public, any act necessary or incidental to the exercise of the powers and functions of the office of notary public.
 
 
 [10]
 Even assuming arguendo that the policy coverage at issue here is no broader than the activities listed as the practice of law in La.Rev.Stat.Ann. Sec. 37:212, supra note 9, tax attorney Snellings' rendering of tax advice would come within the scope of the statute as "the advising or counseling of another as to secular law." Id. Sec. 37:212(2)(a)
 
 
 [11]
 III. Waiver of Exclusion and Breach of Conditions
 Whenever coverage under any provision of this policy would be excluded, suspended or lost
 (a) because of any exclusion or condition relating to dishonest, fraudulent, malicious or criminal acts or omissions by any insured or employee of an insured and with respect to which any other insured did not personally participate or personally acquiesce or remain passive after having personal knowledge thereof, or
 (b) because of noncompliance with any condition relating to the giving of notice to the Company with respect to which any other insured shall be in default solely because of the default or concealment of such default by one or more partners or employees responsible for the loss or damage otherwise insured hereunder:
 the Company agrees that such insurance as would otherwise be afforded under this policy shall continue in effect, cover and be paid with respect to each and every insured who did not personally commit or personally participate in committing or personally acquiesce in or remain passive after having personal knowledge of one or more of the acts or omissions described in any such exclusion or condition, provided that if the condition be one with which such insured can comply, after receiving knowledge thereof, the insured entitled to the benefit of this Waiver of Exclusions and Breach of Conditions shall comply with such condition promptly after obtaining knowledge of the failure of any other insured or employee to comply therewith.