**HUEY T. LITTLETON CLAIMS, INC. and Huey T. Littleton, Plaintiffs–Appellants,**

v.

**EMPLOYERS REINSURANCE CORPORATION, Defendant–Appellee.**

No. 90–4606
Summary Calendar.

United States Court of Appeals, Fifth Circuit.

June 17, 1991.

James B. Doyle, Voorhies & Labbe, Lafayette, La., for plaintiffs-appellants.

Louis Simon, III, Laborde & Neuner, Lafayette, La., for defendant-appellee.

Before JOLLY, HIGGINBOTHAM and JONES, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

Huey T. Littleton Claims Service, Inc., as well as its namesake president,[1] appeals from a declaratory judgment entered in favor of its errors and omissions insurer, Employers Reinsurance Corporation (hereinafter "ERC"). At issue in this controversy is whether Littleton's E & O policy protects it from legal claims that may be brought against it on account of an employee's embezzlement. A United States magistrate, relying on *Jensen v. Snellings*, 841 F.2d 600, 615 (5th Cir.1988), concluded that Littleton would be covered should it suffer liability as a consequence of its negligent supervision of its embezzling employee; the district court disregarded the magistrate's recommendation and, instead, held that Littleton's policy with ERC affords no coverage against prospective lawsuits stemming from the embezzlement. For the reasons that follow, we affirm.

I

We need detail but few facts, none of which is in dispute. Littleton, an insurance claims adjusting company, holds a policy issued by ERC that, appropriately enough, is entitled "Adjuster's Professional Liability Insurance Policy." Two sections of that policy are in question: Section I—"COVERAGE"—provides that the insurance contract covers "liability imposed upon the Assured by law for damages caused by any act or omission of the Assured, or of any person for whose acts the Assured is legally liable, and arising out of the perform-

---

1. For clarity, we have written this opinion as if Littleton Claims Service, Inc. were the only appellant. Unless otherwise stated, however, any reference we make to Littleton, Inc. holds equally true for its president, Huey Littleton.

ance of professional services for others, in the Assured's capacity as an adjuster...." Section VI—"EXCLUSIONS"—provides that "[t]his policy does not apply to: (a) any dishonest, fraudulent, illegal, criminal, or malicious act, other than malicious prosecution."

In August 1980, Littleton hired Tom Foster as a claims adjuster. Foster's responsibilities included managing "trust accounts," pools of funds that belonged to Littleton's clients but that Littleton itself kept on hand and administered. Although at first heavily supervised, Foster eventually attained the authority to manage Littleton's trust accounts with little oversight. In late 1988, a review of accounts catalyzed by Foster's transfer to a newly-opened Littleton office revealed that Foster had skimmed roughly $150,000 from the trust account coffers.

Upon learning of Foster's filching, Littleton reported its loss to Aetna Casualty and Surety, an insurer with which it had a $10,000 employee fidelity policy. After Aetna approved Littleton's claim, the company—still smarting from a $140,000 shortfall—notified ERC of the loss and asked it for indemnification against prospective legal claims made by the owners of the trust accounts. ERC refused: It advised Littleton that should such legal claims be made, it would deny coverage on the ground that the company's losses were attributable to Foster's "dishonest," "criminal" act and thus were excludable under Section VI.

## II

Littleton effectively concedes that, were it only vicariously liable for Foster's theft, its policy with ERC would not apply because of the Section VI exclusion.[2] Consistent with this concession, Littleton asks us to interpret the policy as providing coverage for its "negligent acts or omissions which may have resulted in Foster's embezzlement of funds from clients of the ser-

vice"—that is to say, for Littleton's independent negligence (if any). Because this is a diversity action, we decide Littleton's request on the basis of Louisiana substantive law.

At the outset, we note that on some issues the parties find themselves in agreement. For example, neither side suggests that Littleton committed any "dishonest, fraudulent, illegal, criminal, or malicious act." Furthermore, the litigants all but stipulate that a judgment against Littleton for the loss would fall within Section I of the policy and that, therefore, Littleton is fully covered barring the application of an exclusion.

■ The solitary divisive issue before us, in fact, is whether the policy's dishonest act exclusion reaches liability that may also be imposed upon the company owing to its own negligence. On this question we agree with ERC that the language in Section VI precludes coverage when Littleton's liability for the loss is based upon the excluded conduct of its employee. Irrespective of the legal theory through which Littleton's clients proceed against it—whether vicarious tort liability, independent tort liability, or even contractual liability—Foster's perfidy remains an essential if not the legal proximate cause of the clients' damage. Alternatively stated, regardless of *why* Littleton is held liable, any claim it files with ERC will in the end stem from Foster's "dishonest," "criminal" act—expressly excluded under Section VI.

■ What is more, to adopt the reading advocated by Littleton would be to flout at least two of Louisiana's policy construction principles. First, Louisiana requires a policy to be construed so as to give effect, if possible, to every provision therein. *Hemel v. State Farm Mutual Auto Insurance Co.*, 211 La. 95, 29 So.2d 483 (1947); *Scarborough v. Travelers Insurance Co.*, 718 F.2d 702 (5th Cir.1983); *Gulf Oil Corp. v. Mobile Drilling Barge*, 441

---

2. Littleton does argue—haltingly—that an employer is vicariously liable under Louisiana law only when independently negligent. This argument is specious. In Louisiana, an employer's vicarious liability for the acts of his employees is strict, fault being beside the point. *La.Civ. Code Ann.* art. 2320; *Sampay v. Morton Salt Company*, 395 So.2d 326, 327–328 (La.1981); *Loescher v. Parr*, 324 So.2d 441, 446 (La.1975).

F.Supp. 1 (E.D.La.1975), *aff'd,* 565 F.2d 958 (5th Cir.1978). Under Littleton's reading of its policy, however, the dishonest act provision borders on meaninglessness. If, as Littleton suggests, Section VI applies only to claims charging the company with vicarious liability, Littleton need only concede its negligent supervision of the wrong-doing employee—and hence its independent negligence—in order to circumvent the express exclusion. Furthermore, Louisiana asks that courts interpret policies in such a way as to comport with the parties' intentions (as expressed, of course, in the language of the policy itself). *See generally Graves v. Traders & General Insurance Co.,* 252 La. 709, 214 So.2d 116 (1968). We would be blind not to discern from the text of Section VI a desire to foreclose recovery for losses occasioned by illicit acts such as Foster's.

Finally, our holding is buttressed by the Louisiana Supreme Court's decision in *Lamkin v. Brooks,* 498 So.2d 1068 (La. 1986). The plaintiff in that case, Lamkin, sought damages for injuries he had suffered during a run-in with a Louisiana policeman; in his complaint, he named the assaulting officer, the city that employed him, and their insurer as party-defendants. Although Lamkin alleged that the town was both vicariously and independently negligent,[3] the court, after finding the city vicariously liable, concluded that it "need not reach the issue of independent negligence." *Lamkin,* 498 So.2d at 1071. The court went on, however, to hold that an exclusion clause in the policy (excepting claims "arising out of the willful, intentional or malicious conduct of any [i]nsured," here the police officer) precluded the town from obtaining indemnification from the insurer. *Id.* at 1071. If the supreme court had taken the path Littleton urges us to follow—where independent negligence can afford coverage even when vicarious liabili-

ty expressly cannot—it would have *had* to address the question of the town's independent negligence. The fact that the *Lamkin* court did not strongly implies that underlying negligence on the part of the employer has no bearing on the scope of a policy when an employee for whom the employer is vicariously liable commits acts (or omissions) falling squarely within an exclusionary clause.[4]

Two counterarguments proffered by Littleton do not lead us to a different result. First, like most states Louisiana has adopted the rule that policy ambiguities—especially with respect to exclusions—are to be resolved in favor of the insured. *Benton Casing Service, Inc. v. AVEMCO Insurance Co.,* 379 So.2d 225 (La.1979). More to the point, if an exclusion gives rise to multiple interpretations, "the one affording coverage to the insured will be adopted." *Stewart v. Louisiana Farm Bureau Mutual Insurance Co.,* 420 So.2d 1217 (La.App.1982). These canons come into play, however, only in the event that the policy affords ambiguities; as we have earlier indicated, we see no ambiguity here. *Monteleone v. American Emp. Ins. Co.,* 239 La. 773, 120 So.2d 70 (1960); *Freyoux v. Estate of Bousegard,* 484 So.2d 761 (La.App.1986).

Second and lastly, the analogy Littleton draws between this case and two of our previous decisions, *Terra Resources v. Lake Charles Dredging and Towing,* 695 F.2d 828, 831 (5th Cir.1983), and *Jensen,* 841 F.2d at 600, is inapt.[5] For similar reasons each case is distinguishable. In *Jensen,* two plaintiffs brought RICO and securities actions against their attorney and his firm, which in turn filed claims with their respective professional liability insurers. The plaintiffs' complaint alleged that the individual attorney had chicaned and defrauded them. Seizing on these allega-

---

**3.** Specifically, Lamkin argued that the city was independently negligent for not previously firing the officer, given his (alleged) earlier demonstrated incompetence.

**4.** We are mindful that the *Lamkin* court did not *altogether* ignore the question of the city's independent negligence. *See Lamkin,* 498 So.2d at

1071, n. 5. The mere fact, however, that the court thought it *unnecessary* to devote attention to the independent negligence issue is sufficient to belie Littleton's argument.

**5.** Both of these cases were decided under Louisiana law.

tions, the insurers denied coverage as well as a duty to defend, citing a dishonest act exclusion. In holding that the policies necessitated a defense of the suit by the insurers, we drew a distinction between allegations of dishonesty against the attorney and charges that the firm had failed to supervise him. However, we struck that distinction in the context of deciding whether the insurer owed a duty to defend, an obligation far more expansive than the duty to indemnify. *Jensen,* 841 F.2d at 612. More important still, while embezzlement is instrumental to any allegation against Littleton, "many of the deeds complained of [in *Jensen*] could have negligently occurred *without* the wrongful, fraudulent intent alleged in the complaint." *Id.* at 615 (emphasis added). Just so *Terra Resources:* There, an insured sought indemnification for settlement payments it had made to an oil production company whose refining facilities it had damaged with its barges, which had come untethered from the insured's mooring block during a storm. Although the policy contained a watercraft exclusion,[6] we ruled in favor of the insured, drawing a distinction between theories under which the insured could be held liable. *Terra Resources,* 695 F.2d at 830–831 ("If the sole source of [the insured's] liability were its ownership and use of the barges," "we would wholeheartedly" conclude that the exclusion "bars any claim ... against [the insurer]." However, as owner of the defective mooring block, the insured was "subject to liability independently of its ownership ... of the watercraft"). But as in *Jensen,* we stressed that the two theories of liability were *"completely independent,"*[7] noting

that the insured would still be liable even if the facts surrounding the accident were revised so as to render the watercraft exclusion inapposite. *Id.* at 831.[8] As noted above, it cannot be said here that the two theories are "completely independent"; indeed, they are intimately related—no loss would have occurred but for the "dishonest," "criminal" act of Foster.

### III

For the foregoing reasons, the judgment of the district court is

AFFIRMED.

---

6. The text of the watercraft exclusion follows: This insurance does not apply:

  \* \* \* \* \* \*

  (e) to bodily injury or property damage arising out of the ownership, maintenance, operation, use, loading or unloading of

  (1) any watercraft owned or operated by or rented or loaned to any insured, or

  (2) any watercraft operated by any person in the course of his employment by any insured;

  but this exclusion does not apply to watercraft while ashore on premises owned by, rented to or controlled by the named insured....

7. Emphasis added.

8. "Under the insurance policy, for the exclusion to apply, the watercraft must be owned, used, loaded, unloaded or operated by an insured party or someone in its employ. To be sure, [the insured] did own the runaway barges, but this need not have been the case.... The damage would still have occurred if the barges had not been owned by [the insured or one of its employees]."