IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

No. 99-30532

---

SHELL OFFSHORE INC.;
SHELL DEEPWATER PRODUCTION INC.,

Plaintiffs-Appellants-Cross-Appellees,

versus

BRUCE BABBITT, SECRETARY OF THE DEPARTMENT
OF INTERIOR; BOB ARMSTRONG, ASSISTANT
SECRETARY, LAND & MINERALS MANAGEMENT,
DEPARTMENT OF THE INTERIOR;
WALT ROSENBUSCH, DIRECTOR, MINERALS
MANAGEMENT SERVICE, DEPARTMENT OF THE INTERIOR,

Defendants-Appellees-Cross-Appellants.

---

Appeals from the United States District Court
for the Western District of Louisiana

---

January 12, 2001

Before GARWOOD, HIGGINBOTHAM, and STEWART, Circuit Judges.

GARWOOD, Circuit Judge:

Plaintiff-appellant Shell Offshore, Inc., (Shell) sued the Department of the Interior (Interior) under the citizen suit provisions of the Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1331 *et seq.* (§ 1349(b)) (OCSLA), the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* (§ 704) (APA), and the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, challenging Interior's denial of Shell's request to use its Federal Energy Regulatory Commission

(FERC) tariff rate as the cost of transporting crude oil produced from certain of Shell's offshore oil and gas leases for purposes of calculating Shell's royalty payments due Interior. The district court granted Shell's summary judgment motion in part, holding that Interior's decision denying the use of the tariff rate was arbitrary and capricious, and was a new substantive rule that required notice and comment under the APA, 5 U.S.C. § 553. We agree with the district court that Interior's decision was in essence the application of a new substantive rule that required notice and comment before implementation. We hold that Shell was entitled to use the FERC tariff rate to calculate transportation costs for all of the oil at issue in this case which it transported through the Auger pipeline, and was therefore entitled to have its motion for summary judgment granted in full. Accordingly, we affirm in part, reverse in part, and remand for entry of appropriate judgment consistent herewith.

### Facts and Proceedings Below

Shell is the lessee in numerous federal leases for the production of crude oil and gas located offshore Louisiana within the Auger Unit on the Outer Continental Shelf (OCS).[1] These leases were issued by Interior through its sub-agency, the Minerals Management Service (MMS), under the authority of the OCSLA, 43 U.S.C. §§ 1331 *et seq*. This dispute involves Shell's royalty

---

[1] A "unit" is an area containing leases located on the OCS.

payments on crude oil produced from offshore leases comprising Shell's Auger Unit. Under the OCSLA and the terms of the leases, Shell is required to pay royalties as a specified percentage of the "value of the production saved, removed, or sold" from the lease. 43 U.S.C. § 1337(a)(1)(A). Interior is responsible for administering leases on the OCS, and promulgates regulations governing royalty collection and establishing the value of production on which lessees pay royalties.

Under the regulations in effect at the time, Interior allowed lessees to deduct transportation costs from the value on which they calculated royalty payments. Those regulations distinguished between transportation costs incurred under "arms-length" agreements with common carriers and "non-arms-length" transportation costs, such as when a lessee transports the oil itself or via a pipeline owned by an affiliate of the lessee. *See* 30 C.F.R. § 206.105(a)-(b).

Shell began producing from the Auger Unit in April 1994. The Auger pipeline transports crude oil from the Auger Unit to a series of other pipelines that begins on the OCS, crosses onshore into Louisiana, and eventually reaches other states. The district court found, and Interior does not dispute, that some portion—apparently a substantial majority—of the oil produced in the Auger Unit travels in a continuous stream to Illinois for refining. The oil that reaches Illinois travels first through the Auger pipeline and

-3-

then, via several pipeline systems, to St. James, Louisiana, and from there through the Capline/Capwood pipeline system to the Wood River refinery in Illinois. The Auger pipeline is owned by a Shell affiliate. The parties agree that the transport of Shell's oil through the Auger pipeline was a non-arms-length transaction, and that therefore the calculation of Auger pipeline transport costs Shell could permissibly deduct from its royalty payments was governed by 30 C.F.R. § 206.105(b). Under section 206.105(b)(2), lessees must demonstrate their actual costs of transport for deduction from their royalty payments due Interior, and the regulation provides detailed instructions for such calculations. Under section 206.105(b)(5), however, lessees are granted an exception from the requirement of showing actual costs of transport if the lessee has "a tariff for the transportation system approved by the [FERC]." *Id.* Under this exception, the lessee can use the FERC tariff rate to calculate their transportation cost deductions from royalty payments if that tariff has been "approved by the [FERC]." *Id.*[2]

---

[2] 30 C.F.R. § 206.105(b)(5) (1999) provided:

"(5) A lessee may apply to the MMS for an exception from the requirement that it compute actual costs in accordance with paragraphs (b)(1) through (b)(4) of this section. The MMS will grant the exception only if the lessee has a tariff for the transportation system approved by the Federal Energy Regulatory Commission (FERC) (for both Federal and Indian leases) or a State regulatory agency (for Federal leases). The MMS shall deny the exception request if it determines that the tariff is excessive as compared to arm's length

-4-

Interior points to several recent FERC opinions, commencing in 1992, that, it argues, cast FERC jurisdiction over pipelines on the OCS into some doubt.[3] It is and was FERC's practice to automatically accept all filed tariffs unless a timely protest is filed. Prior to 1993, MMS (the sub-agency of Interior responsible for administering the OCS leases) accepted tariffs that were filed with FERC in determining whether a lessee qualified for an

> transportation charges by pipelines, owned by the lessee or others, providing similar transportation services in that area. If there are no arm's length transportation charges, MMS shall deny the exception request if: (i) No FERC or State regulatory agency cost analysis exists and the FERC or State regulatory agency, as applicable, has declined to investigate pursuant to MMS timely objections upon filing; and (ii) the tariff significantly exceeds the lessee's actual costs for transportation as determined under this section."

> It is undisputed that in this case neither of the conditions stated in clauses (i) and (ii) of the last sentence of § 206.105(b)(5) is applicable and also that MMS never made the determination referred to in the next to last sentence of § 206.105(b)(5).

> The relevant regulations have now been formally changed (effective June 1, 2000), in part to address the exact issues that are in dispute in this case. *See* 62 Fed. Reg. 3742, 3746 (Jan. 24, 1997). Under the current regulations, lessees may still deduct non-arms-length transportation costs, but they cannot rely on FERC tariff rates as a substitute for demonstrating the actual costs of transport. *Compare* 30 C.F.R. § 206.105(1999) *with* 30 C.F.R. § 206.111 (as amended March 15, 2000, effective June 1, 2000; 65 Fed. Reg. 14022, 14031, 14088 *et seq.*, March 15, 2000). References to Interior's regulations in this opinion refer to the rules in effect at the time of suit unless otherwise noted.

> This case does not involve oil produced on or after June 1, 2000.

[3] The decisions were *Oxy Pipeline, Inc.*, 61 FERC 61,051 (1992), and *Bonito Pipeline Co.*, 61 FERC 61,050 (1992). Later in the adjudicative process, Interior also relied on *Ultramar, Inc., v. Gaviota Terminal Co.*, 80 FERC 61,201 (1997).

exception under 30 C.F.R. § 206.105(b)(5). From 1988 until some point in 1993 or 1994,[4] MMS accepted as "approved by FERC" most tariffs that were simply filed with FERC, and did not require producers to petition FERC for a determination of jurisdiction. By 1994, however, Interior was disallowing use of the tariff exception for OCS lessees that it felt might no longer be within FERC jurisdiction.

Shell filed a tariff with FERC on March 2, 1994, which was unprotested, and was accepted and published by FERC on April 1, 1994. In a letter dated July 7, 1994, Shell requested that the MMS confirm that, in valuing Shell's Auger Unit crude oil production for royalty purposes, Shell was entitled to deduct as transportation costs the tariff rate accepted by FERC for the Auger pipeline. In an order dated November 10, 1994, the MMS denied Shell's request, and Shell appealed the order. Several administrative appeals followed, but in its final decision on August 13, 1998, Interior stated that Shell's request was being denied because Shell had failed to petition FERC and receive from FERC a determination affirmatively stating that FERC possessed

_____

[4] On November 10, 1994, MMS denied Shell's request to use the FERC tariff on the grounds that because of the FERC's decision in *Oxy Pipeline, Inc.*, 61 FERC 61,051 (1992), FERC had no jurisdiction over OCS pipelines and therefore could not "approve" Shell's tariff. Interior's "Dear Payor" letter of December 18, 1998, sent generally to OCS lessee oil royalty payors (including Shell), states that "[b]eginning with production in January, 1993," MMS "began to deny requests for approving FERC tariffs in lieu of actual costs for non-arm's-length OCS oil transportation allowances."

jurisdiction over the Auger pipeline.

Shell then filed the instant lawsuit. Thereafter, on December 18, 1998, MMS sent a "Dear Payor" letter to Shell stating that due to uncertainty concerning FERC's jurisdiction over pipelines on the OCS, lessees must "petition FERC" and receive from FERC "a determination affirmatively stating that it has jurisdiction" before MMS will allow the lessee to use the FERC tariff to calculate transportation costs for the purposes of royalty calculations. Similar letters were sent to other OCS lessees.

In the district court, Shell claimed that its FERC tariff established the rate Shell could permissibly deduct from its royalty payments for transporting oil through the Auger pipeline. Interior argued that FERC's jurisdiction had not been clearly established and that if FERC did not have jurisdiction, then FERC could not establish the appropriate rate and "approve" the tariff within the meaning of § 206.105(b)(5).

Both Shell and Interior moved for summary judgment in the district court. The district court denied Interior's motion and partially granted Shell's motion. The district court found that there was no rational connection between the FERC's decisions in *Ultramar* and *Oxy* and Interior's decision to wholly deny Shell's request. *See Shell Offshore, Inc., v. Babbit*, 61 F.Supp.2d 520, 528 (W.D. La. 1999). The court held that Interior had failed to

adequately consider the evidence of interstate transportation of the oil submitted by Shell, and that Interior's decision was therefore arbitrary and capricious. *Id.*

The district court also held that the notice and comment provisions of the APA were applicable to Interior's change in policy. The district court applied the test set out by this Court in *Phillips Petroleum Co. v. Johnson*, 22 F.3d 616 (5th Cir. 1994) that dictates when exemption from APA notice and comment is proper for rules that govern "rules of agency organization, procedure, or practice." *Id.* at 616. *See also* 5 U.S.C. § 553(b)(A). Despite its holding that Interior's new policy required notice and comment under the APA, the district court only partially granted Shell's summary judgment motion. The court reasoned that "[t]ransporting the crude [oil] to a refinery in Louisiana is not interstate and the holding in *Ultramar* is applicable to crude transported from the OCS to Louisiana," and held that Shell's tariff was not applicable to the portion of the Auger crude oil that did not leave Louisiana unrefined. *Shell Offshore*, 61 F.Supp.2d at 529. Both Shell and Interior timely appealed.

### Discussion

This case involves two basic issues. The first is whether Interior's policy change-requiring OCS lessees to petition FERC for an affirmation of jurisdiction-is a new "rule" that triggers the notice and comment provisions of the APA. If Interior had, from

-8-

the beginning, interpreted their regulation as requiring an affirmation of FERC jurisdiction, their interpretation of their own regulation would be entitled to substantial deference. However, Interior changed their policy–they began to require lessees (and required Shell in this case) to petition FERC for an affirmation of jurisdiction whereas from 1988 to 1993 their established procedure was to treat tariffs that were simply filed with the FERC as "approved" under § 206.105(b)(5). A party may not lawfully be adversely affected by a rule promulgated in violation of the requirements of the APA. *See* 5 U.S.C. § 552(a)(1). Interior's new policy was never submitted for notice and comment. If Interior's change in policy is a new substantive rule for APA purposes the rule is invalid.

The second issue need be reached only if Interior's policy change was not a new rule for APA purposes. If the change was not such a rule, then Interior's decision must still satisfy the APA standard of not being arbitrary and capricious. *See Acadian Gas Pipeline Sys. v. FERC*, 878 F.2d 865 (5th Cir. 1989).[5] If Interior's new policy was a "rule" for APA purposes, we need not reach the arbitrary and capricious issue.

---

[5] In that case, we stated: "Where an agency has acted arbitrarily or capriciously, a reviewing court is bound to set aside the agency action. Where an agency fails to distinguish past practice, its actions may indicate that lack of reasoned articulation and responsibility that vitiates the deference the reviewing court would otherwise show." *Acadian,* 878 F.2d at 868 (citations omitted).

This Court reviews the district court's grant of summary judgment *de novo*. *Hernandez v. Reno*, 91 F.3d 776, 779 (5th Cir. 1996). Summary judgment is appropriate if the record shows "that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). In reviewing the underlying agency decision denying Shell's request, the general standard under the APA is whether the agency's final decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A); *Avoyelles Sportsmen's League, Inc., v. Marsh*, 715 F.2d 897, 904 (5th Cir. 1983). Determining whether Interior's policy change was a "rule" for APA purposes is purely a matter of construction of the APA and we review this issue *de novo*. *Phillips*, 22 F.3d at 619 ("'[T]he label that the particular agency puts on upon its given exercise of administrative power is not, for our purposes, conclusive; rather, it is what the agency does in fact.'[] We review this legal issue *de novo*.") (citations omitted) (quoting *Brown Express, Inc., v. United States*, 607 F.2d 695, 700 (5th Cir. 1979)). Interior is not charged with administering the APA; its conclusions of law regarding whether its policy change is a "rule" for APA purposes are not given deference and are also reviewed *de novo*. *See Institute for Technology Development v. Brown*, 63 F.3d 445, 450 (5th Cir. 1995).

**The Rulemaking Requirements of the APA**

-10-

Interior argues that the district court erred when it ruled that Interior's new policy was a legislative rule subject to the notice and comment requirements of the APA. Interior claims, initially, that the decision in this case was an "adjudication" and was therefore exempt from the rulemaking requirements of 5 U.S.C. § 553. In the alternative, Interior argues that even if the new policy is a "rule" it is an interpretive rule rather than a substantive one, and is thus exempt from the APA's notice and comment requirements under 5 U.S.C. § 553(d)(2).

The APA defines a "rule" as "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes ... practices bearing on any of the foregoing." 5 U.S.C. § 551(4). Rulemaking is the "agency process for formulating, amending, or repealing a rule." *Id.* at § 551(5). In contrast, the APA defines an "adjudication" as "an agency process for the formulation of an order," and defines "order" as "the whole or part of a final disposition ... of an agency in a matter other than rule making but including licencing." *Id.* at § 551(6), (7). There is no notice and comment requirement for an agency adjudication. *Id.* at § 554. Similarly exempted from the notice and comment requirements are "interpretive rules." *Id.* at § 553(d)(2).

Interior argues that this case merely involves an

"adjudication" exempt from the rulemaking requirements of the APA, and, in the alternative, that the new rule is merely "interpretive." Shell's response to the first part of Interior's argument is that the decision in the adjudication in this case was wholly predicated upon a new requirement that is, in effect, a new "substantive" rule. We conclude that Shell's argument is the more persuasive. It is clear from Interior's internal memoranda and correspondence with Shell that Interior's denial of Shell's request was the result of a departure from Interior's previous practice of treating as approved all filed FERC tariffs. It is similarly clear that Interior's new policy was the basis for the adjudication rather than the facts of the particular adjudication causing Interior to modify or re-interpret its rule. Interior did not apply a general regulation to the specific facts of Shell's case. Rather, it established a new policy and then applied that new policy to several OCS producers, including Shell. If Shell had submitted its tariff early in 1992 instead of 1994, Interior would have accepted Shell's tariff as "approved by FERC" and Shell would not have been required to petition FERC--there would have been no adjudication prior to 1994. The adjudication resulted because Interior changed its policy, and the district court did not err in reaching the policy change that controlled the adjudicative process.

Interior also argues that their new policy should be

considered an "interpretive" rule, and should therefore be exempt from the notice and comment requirements of the APA. In *Brown Express Inc. v. United States,* 607 F.2d 695 (5th Cir. 1979), we repeated with approval the District of Columbia Circuit's distinction between interpretive and substantive rules: "'Generally speaking, it seems to be established that 'regulations,' 'substantive rules,' or 'legislative rules' are those which create law; whereas interpretive rules are statements as to what the administrative officer thinks the statute or regulation means.'" *Id.* at 700. (quoting *Gibson Wine Co. v. Snyder*, 194 F.2d 329, 331 (D.C. Cir. 1952)). Legislative or substantive rules are those which "affect individual rights and obligations." *See Chrysler Corp. v. Brown*, 99 S.Ct. 1705, 1718 (1979) (citations omitted). We now review some of our prior cases on this topic.

In *Phillips Petroleum Co. v. Babbit*, 22 F.3d 616 (5th Cir. 1994), MMS issued an unpublished internal agency paper that changed the procedure for determining oil and gas royalties. The original regulation directed MMS to consider a variety of factors in valuing offshore production, including the highest prices for such production in the area, the price paid by the lessee, posted prices, regulated prices, and other factors. *Id.* at 618. MMS's new policy under the agency paper was to focus only on the "spot price" instead of the enumerated factors in the regulation. Unlike the present case, MMS admitted in *Phillips* that the procedure paper

was a new "rule."  Just as Interior asserts now, however, in *Phillips* MMS asserted that the paper merely interpreted the existing regulation and was therefore a clarification of existing regulations rather than a substantive modification.  We held that the procedure paper was not an "interpretive rule" and was subject to the notice and comment requirements of the APA.  *Phillips*, 22 F.3d at 621.  However, unlike the present case, in *Phillips* the procedure paper directly contradicted the text of the regulation at issue.

In *Davidson v. Glickman*, 196 F.3d 996 (5th Cir. 1999), we held that a provision of a Farm Services Agency (FSA) handbook was a substantive rule that required notice and comment under the APA.  The provision prohibited revision of acreage reports if the producer would benefit from the revision.  The regulation in question did not mention this condition on revision of acreage reports.  We held that the provision was indeed a legislative (or substantive) rule that required notice and comment under the APA, and invalidated the application of the handbook provision.  *Id.* at 999.

In the present case, the new "rule" that Shell asserts violates the APA is not a change from a written policy statement or regulation.  Rather, it is an alteration of an existing practice.  From 1988 through 1993, Interior treated all filed tariffs as approved by the FERC; now it requires lessees in Shell's position

to (as stated in the "Dear Payor" letter, see note 4 *supra*) "petition FERC" and receive from FERC "a determination affirmatively stating that it has jurisdiction over the pipelines in question". This case is somewhat different from *Glickman* and *Phillips* in that the new interpretation of "approved by FERC" does not directly and expressly contradict the regulation itself. Instead, it contradicts Interior's prior consistent interpretation of the regulation. A further complication is that each of Interior's interpretations of § 206.105(b)(5)—the new interpretation as well as the old—may perhaps, independently, qualify as an "interpretive rule" that is exempt from notice and comment under the APA, in that each interprets an arguably ambiguous regulation.[6] Assuming that each of Interior's interpretations of their regulation are valid interpretive rules, a significant issue remains: can Interior switch from one consistently long followed permissible interpretation to a new one without providing an opportunity for notice and comment?

In a line of recent cases, the D.C. Circuit has addressed this very issue. In *Alaska Professional Hunters Ass'n v. FAA*, 177 F.3d 1030 (D.C. Cir. 1999), a regional office of the FAA had for many

---

[6] Agencies need not provide notice and comment for every meaningful policy decision. Interpretations of ambiguous or unclear regulations by agencies may be exempt from the APA's notice and comment requirements. *See* 5 U.S.C. § 553(b)(A), *Phillips*, 22 F.3d at 619, *Brown Express v. United States*, 607 F.2d 695, 700 (5th Cir. 1979). We express no opinion as to whether either of Interior's interpretations of § 206.105(b)(5) are valid interpretive rules.

-15-

years been advising Alaskan hunting and fishing guides that they were exempt from FAA regulations governing commercial pilots.[7] At some point in the early 1990's, the FAA discovered that their regional office had been telling the Alaskan guide pilots that they were exempt, and in 1998 the FAA published a "Notice to Operators" which announced that Alaskan guides who transport customers by aircraft were no longer considered exempt from the FAA's safety regulations. 63 Fed. Reg. 4 (1998). The court ruled that the FAA's action required notice and comment, and that the new interpretation of their regulation was invalid without it. *Alaska*, 177 F.3d at 1036. The court, relying on *Paralyzed Veterans of America v. D.C. Arena*, 117 F.3d 579 (D.C. Cir. 1997), stated: "When an agency has given its regulation a definitive interpretation, and later significantly revises that interpretation, the agency has in effect amended its rule, something it may not accomplish without notice and comment." *Alaska*, 177 F.3d at 1034. We agree with the reasoning of the D.C. Circuit; the APA requires an agency to provide an opportunity for notice and comment before substantially altering a well established regulatory interpretation. We turn now to Interior's new interpretation of § 206.105(b)(5).

---

[7] The regulations in question were 14 C.F.R. §§ 121.1(a)(5), (d), and 135.1(a)(2) (1965), which applied to "commercial operator[s]," who were defined as persons operating aircraft "for compensation or hire". *Id*. At the time of the *Alaska* case, those regulations continued to apply to "commercial operator[s]," who were still defined as persons who, "for compensation or hire," carry people or property by aircraft. *See* 14 C.F.R. §§ 1.1, 119.1(a)(1), 121.1(a), 135.1(a)(1) (1999).

In 1988, Interior utilized a regulatory practice based on § 206.105(b)(5) that it apparently felt adequately governed OCS lessees' non-arms-length transportation deductions from royalty payments: it accepted as "approved" all tariffs filed with FERC. When FERC declined jurisdiction over some OCS pipelines under certain conditions, Interior adapted their regulatory practices to include an additional procedural step–OCS lessees in Shell's position were denied use of their FERC tariff for royalty calculations unless they petitioned FERC and received from FERC a determination affirmatively stating that FERC had jurisdiction. Even though Interior never set forth its interpretation of section 206.105(b)(5)'s "approved by FERC" in a written statement, it was undeniably its long established and consistently followed practice to accept tariffs filed with FERC as "approved" for purposes of section 206.105(b)(5).[8] An agency that, as a practical matter, has

---

[8] Interior accepted the FERC tariffs for at least five years, from 1988 until 1993, when, according to its December 1998 "Dear Payor" letter, Interior "*began* to deny requests for approving FERC tariffs in lieu of actual costs for non-arm's-length transportation allowances." (emphasis added). Interior argues that since this letter is not part of the administrative record, it should not have been considered by the district court. As Interior correctly points out, it is well established that reviewing courts generally should, in evaluating agency action, avoid considering evidence that was not before the agency when it issued its final decision. *See Louisiana v. Verity*, 853 F.2d 311, 327 n.8 (5th Cir. 1988), *Camp v. Pitts*, 93 S.Ct. 1241, 1244 (1973). Agency actions should generally be reviewed in light of the evidence before the agency at the time, and not with the benefit of hindsight. But the "Dear Payor" letter is not evidence that could or should have been used by the agency to formulate policy. Instead, it is evidence *of* agency policy. The district court did not err in considering it.

enacted a new substantive rule cannot evade the notice and comment requirements of the APA by avoiding written statements or other "official" interpretations of a given regulation. If a new agency policy represents a significant departure from long established and consistent practice that substantially affects the regulated industry, the new policy is a new substantive rule and the agency is obliged, under the APA, to submit the change for notice and comment. If Interior wishes to change its established practices and procedures in a manner that so significantly affects OCS lessees, it must give them notice and an opportunity to comment on the proposed change.[9] Interior's new practice may be a reasonable change in its oversight practices and procedures, but it places a new and substantial requirement on many OCS lessees, was a significant departure from long established and consistent past practice, and should have been submitted for notice and comment before adoption. Interior's new interpretation of "approved by [FERC]" in section 206.105(b)(5) accordingly meets the requirements for a new legislative rule under the APA.

Under the APA, "a person may not in any manner be required to resort to, or be adversely affected by, a matter required to be

---

[9] As we observed above (see note 2, *supra*), effective June 1, 2000, Interior has formally changed the regulations governing royalty calculations. Under the new regulations, no lessee can use an FERC tariff to calculate its transportation costs. Instead, lessees using affiliated pipelines must now show their actual transportation costs. *See* 30 C.F.R. § 206.111 (as amended March 15, 2000, effective June 1, 2000).

published in the Federal Register and not so published". 5 U.S.C. § 552(a)(1). Since Shell cannot lawfully be affected by this new requirement, until Interior properly promulgates a new regulation it cannot require more of Shell than filing their tariff with FERC. Shell was thus entitled to use their FERC filed tariff to calculate transport costs for all oil produced in the Auger Unit and sent through the Auger pipeline. The district court should have granted Shell's summary judgment motion in full. Because Interior's new policy was a "rule" that required notice and comment under the APA, we need not reach the issue of whether Interior's action in this case was arbitrary and capricious.

## Conclusion

Interior's new policy is a substantive rule for purposes of the APA, and Interior was required to submit their new rule for notice and comment. The district court's holding that Interior's new rule is invalid under the the APA is affirmed. Prior to Interior's policy change, Shell's FERC tariff would have been routinely accepted by Interior for all oil flowing through the Auger pipeline. Since no party can be adversely affected by an agency rule that should have been but was not submitted for notice and comment, Shell is entitled to use their FERC tariff in lieu of showing actual costs for all of the oil at issue in this case which they transported through the Auger pipeline, not just the oil that eventually crossed unrefined into another state. The district

court should have granted Shell's motion for summary judgment in full.  Accordingly, the judgment of the district court is

AFFIRMED in part,

REVERSED in part,

and REMANDED.