# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

———————

No. 06-3263

———————

| | | |
|---|---|---|
| State of Minnesota, | * | |
| | * | |
| Petitioner, | * | |
| | * | On Petition for Review of an |
| v. | * | Order of the Secretary of |
| | * | Health and Human Services. |
| Centers for Medicare and Medicaid | * | |
| Services; Leslie V. Norwalk, in her | * | |
| official capacity as Deputy | * | |
| Administrator for the Centers for | * | |
| Medicare & Medicaid Services; | * | |
| Michael O. Leavitt, in his official | * | |
| capacity as Secretary of the United | * | |
| States Department of Health and | * | |
| Human Services, | * | |
| | * | |
| Respondents. | * | |

———————

Submitted: May 16, 2007
Filed: July 31, 2007

———————

Before WOLLMAN, BRIGHT, and JOHN R. GIBSON, Circuit Judges.

———————

BRIGHT, Circuit Judge.

In March 2003, the state of Minnesota submitted a state plan amendment ("2003 plan amendment") to the Centers for Medicare and Medicaid Services ("Medicaid Services" or "CMS"), seeking a $1,529,000 increase in the annual supplemental

Medical Assistant payments made by the federal Medicaid program to fourteen county-owned nursing homes. After requesting additional information from the state, Medicaid Services disapproved the 2003 plan amendment and denied Minnesota's request for reconsideration. The state now petitions this court to review and reject the final determination of the Secretary of Health and Human Services ("HHS") adverse to Minnesota. We deny the petition.

I.

The Medicaid program, authorized by Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v, benefits children, the poor, and the elderly. We have observed that "[a]lthough a state's participation in the Medicaid program is optional, participating states in compliance with the applicable federal rules and regulations are given matching funds by the federal government." Bowlin v. Montanez, 446 F.3d 817, 818 (8th Cir. 2006); see 42 U.S.C. § 1396 (requiring participating states to submit for approval "plans for medical assistance"). Minnesota's petition centers on three rules. A state's plan must: (1) "provide for financial participation by the State equal to not less than 40 per centum of the non-Federal share of the expenditures under the plan," 42 U.S.C. § 1396a(a)(2); (2) "provide such safeguards as may be necessary to assure that eligibility for care and services under the plan will be determined, and such care and services will be provided, in a manner consistent with simplicity of administration and the best interests of the recipients," 42 U.S.C. § 1396a(a)(19); and (3) "assure that payments are consistent with efficiency, economy, and quality of care," 42 U.S.C. § 1396a(a)(30)(A).

Minnesota's 2003 plan amendment requested additional federal funds to match the state's decision to increase supplemental payments to county-owned nursing homes. See 2003 Minn. Laws ch. 9, sec. 2 (codified at Minn. Stat. § 256B.431, subd.

23(d) (2004)).[1]  The state legislation allocated $1,529,000 from the state's general fund, see 2003 Minn. Laws ch. 9, sec. 3, and simultaneously increased the intergovernmental transfer payments paid by the counties to the state, see Minn. Stat. § 256B.19, subd. 1d(d) (2004).[2]  Intergovernmental transfers move funds from localities to the state.  The increased intergovernmental transfers, according to the state, represented the counties' share of Medicaid expenses funded through local property taxes.

Minnesota requested federal Medicaid funds to match the state's allocation from its general fund:

> C.  Beginning in 2003, in addition to the payments in items A and B, on May 31 the Department [of Health and Human Services] shall pay to a nursing facility described in item A a disproportionate share nursing facility payment adjustment in an amount equal to $12.32 per calendar day multiplied by the number of beds licensed in the nursing facility on May 31, multiplied by 181 days. . . .

Minn.  SPA No. 03-06, attach. 4.19-D (NF), sec. 20.080(C.).

---

[1]"Beginning in 2003, in addition to any payment under paragraphs (a) and (c), the commissioner shall pay to a nursing facility described in paragraph (a) an adjustment in an amount equal to $6.11 per calendar day multiplied by the number of beds licensed in the facility on that date. . . ."  Minn. Stat. § 256B.431, subd. 23(d) (2004).

[2]"Beginning in 2003, in addition to any transfer under paragraphs (b) and (c), each of the governmental units designated in this subdivision shall transfer before noon on May 31 to the state Medicaid agency an amount equal to the number of licensed beds in any nursing home owned and operated by the county on that date, with the county named as licensee, multiplied by $2,230."  Minn. Stat. § 256B.19, subd. 1d(d) (2004).

Medicaid Services, however, requested additional information from the state. See 42 U.S.C. § 1396n(f)(2) (permitting Secretary to request in writing "any additional information which is needed in order to make a final determination with respect to the request"). In a June 2003 letter, Medicaid Services asked Minnesota to explain: (1) whether the services funded by the 2003 plan amendment complied with 42 U.S.C. § 1396a(a)(30)(A) (the "efficiency, economy, and quality of care" rule); (2) how the services were funded; (3) whether counties funded the non-federal portion of the Medicaid payment; (4) the role of intergovernmental transfers in the funding mechanism; (5) whether the nursing homes retained all of the Medicaid payments; and (6) whether the payments were below the upper payment limit.

Before the state could respond Medicaid Services sent a second request in August 2003 asking: (1) whether the nursing facilities retained all of the Medicaid funds paid to them or whether they returned funds to the state or their local governments; (2) if the state complied with the 40 percent state-share requirement of 42 U.S.C. § 1396a(a)(2) and how the state provided its share (through legislative appropriations, intergovernmental transfers, or other means); (3) if the payments complied with 42 U.S.C. § 1396a(a)(30)(A)'s "efficiency, economy, and quality of care" rule; (4) for a detailed upper payment limit calculation; and (5) whether the state recoups any payments to facilities that exceed the cost of services.

Minnesota responded to the requests in August 2003. Notably, the state equated Medicaid's upper payment limit with § 1396a(a)(30)(A)'s efficiency requirement and observed that:

> [i]f CMS [Medicaid Services] now finds that the upper payment limit . . . is set so high that it allows payment rates that are inefficient and not economical, then the proper response should be to amend the upper payment limit regulation, not to impose new, burdensome requirements on states to justify payment rates that are below the upper payment limit, especially against an unspecified standard.

J.A. at 60.

-4-

Consistent with its reliance on the upper payment limit, Minnesota also responded that "[n]one of the funds are 'returned.' Once the Medical Assistance program pays a provider, the funds are not tracked." J.A. at 63. As a result, the state could not "calculate a ratio between the state and local share of the nonfederal share of Medicaid," though it assured Medicaid Services that the state's share exceeded the 40 percent required by § 1396a(a)(2). J.A. at 65.

Finally, the state made the claim that "a rate can comply with the efficiency and economy requirement . . . without a comparison to cost, or even be above cost, as long as the rates are under the required limits . . . . Because there is no cost limit, a payment is not necessarily excessive simply because it may be greater than cost." J.A. at 66.

## II.

To understand Minnesota's responses to Medicaid Services, it is necessary to briefly explain Medicaid's upper payment limit. To help control rising Medicaid expenses HHS established the upper payment limit, which created a Medicaid payment ceiling based on expenses that would be allowed under Medicare payment rules. See Indep. Acceptance Co. v. California, 204 F.3d 1247, 1250 n.5 (9th Cir. 2000) (citing 42 C.F.R. § 447.253(a), (b)(2)). A state must assure Medicaid Services that the payments requested through a plan amendment do not exceed the upper payment limit before Medicaid Services may approve the plan. But, prompted by ever rising Medicaid reimbursements, the Government Accountability Office ("GAO") and the Office of the Inspector General determined in 2001 that even the upper payment limit lead to "misuse and excessive federal Medicaid spending."[3] Alaska Dep't of Health & Soc. Servs. v. Ctrs. for Medicare and Medicaid Servs., 424 F.3d 931, 936 (9th Cir. 2005).

HHS amended the upper payment limit regulations in 2001, see Revision to the Medicaid Upper Payment Limit Requirements, 66 Fed. Reg. 3148 (Jan. 12, 2001), but

---

[3]The Government Accountability Office was known until July 7, 2004, as the General Accounting Office.

the problem continued.  In 2003 the GAO identified Medicaid as a high-risk program, concluding that "[l]imited oversight has afforded states and health care providers the opportunity to increase federal funding inappropriately."  GAO, Performance & Accountability Series: Dep't of Health & Human Servs., "Highlights" (2003).  One concern in particular provoked Medicaid Services's scrutiny of Minnesota's 2003 plan amendment.  The GAO reported that:

> For more than a decade, states have used various financing schemes to inappropriately generate excessive federal Medicaid matching funds while their own share of expenditures has remained unchanged or decreased. Using statutory and regulatory loopholes, some states have created the illusion that they have made large Medicaid payments to certain providers, such as county health facilities, in order to generate federal matching payments. *In reality, generally through electronic funds transfers, the states have only momentarily made payments to these providers, as states have required the payments to be returned.*
>
>     . . . .
>
> Although the Congress and CMS [Medicaid Services] have repeatedly acted to curtail abusive financing schemes when they have come to light, states have consistently developed new variations to this basic approach. Each variant has the same result: the state's share of program expenditures is shifted to the federal government, while federal Medicaid payments escalate, with no assurances that the excessive federal payments are used for valid Medicaid expenditures for covered beneficiaries.

Id. at 27-28 (emphasis added).  Minnesota's responses did not distinguish the 2003 plan amendment from the scheme described by the GAO.

Medicaid Services initially disapproved the 2003 plan amendment in June 2004. The state sought reconsideration, but Presiding Official Kathleen Scully-Hayes reached the same conclusions in her proposed hearing decision.  The official rejected the contention that compliance with the upper payment limit is alone sufficient because "CMS [Medicaid Services] is obligated to inquire further to ensure that the SPA [state plan amendment] complies with the statutory requirements set forth [sic] § 1902(a)(30)(A)."  The official continued, "[t]he problem is that Minnesota has

offered nothing to show that those funds would be specifically earmarked by the individual counties for use solely by the nursing facilities for their patients." "For the same reasons," the official concluded that Minnesota has not shown compliance with § 1396a(a)(19), which requires plans that are in the "best interests of the recipients." Finally, the official rejected Minnesota's argument that Medicaid Services was imposing new requirements because, according to her "CMS [Medicaid Services] is simply taking a closer look at SPAs before approving them," which "does not trigger a rulemaking requirement."

Minnesota timely filed its exceptions to the proposed hearing decision. The state primarily argued that Medicaid Services's request for additional information represented a "substantial new criterion" for state plan amendment approval and that the new approach effectively prohibited the use of intergovernmental transfers, in violation of 42 U.S.C. § 1396b(w)(6)(A). Minnesota also drew attention to various assurances and affidavits it provided throughout the hearing and reconsideration process, which supported approval but, according to the state, Medicaid Services ignored.

Medicaid Services, through Deputy Administrator Leslie Norwalk, adopted the presiding official's proposed hearing decision, making the disapproval the final decision of the Secretary. The deputy administrator's decision reiterated Minnesota's failure to explain its Medicaid funding mechanism, leaving Medicaid Services unable to determine whether the 2003 plan amendment complied with § 1396a(a)(2) (setting out the 40 percent rule). While acknowledging that intergovernmental transfers are permitted, the deputy administrator explained that "[i]f providers refund part or all of the Medicaid payments to the State, or its political subdivisions, the proposed payment rate would not reflect the net expenditures and the net non-Federal share would not meet the requirements" of the Act. Similarly, the decision observed that Minnesota provided "unsupported assertions" to ensure that the 2003 plan amendment met § 1396a(a)(30)(A)'s "efficiency, economy, and quality of care" requirement and observed that the state's failure to explain its funding system and monitor the use of Medicaid funds by county-owned nursing facilities left Medicaid Services unable to

ensure compliance with the Act. For similar reasons, the deputy administrator also concluded that Medicaid Services could not determine that the 2003 plan amendment complied with § 1396a(a)(19) (requiring payments in "the best interest of the recipients"). This appeal followed.

### III.

Medicaid is a federal-state partnership that HHS is obligated to administer. In 2003 the GAO identified it as a high-risk program, concluding that "[l]imited oversight has afforded states and health care providers the opportunity to increase federal funding inappropriately." GAO, Performance & Accountability Series: Dep't of Health & Human Servs., "Highlights" (2003). This petition tests the ability of the Secretary to increase his oversight of the program.

Minnesota's petition raises two issues, both governed by The Administrative Procedures Act ("APA"), 5 U.S.C. § 701 et seq. The first is whether the Secretary's rejection of its 2003 plan amendment was predicated on a "new substantive rule" requiring notice and comment rule making. See Shell Offshore Inc. v. Babbitt, 238 F.3d 622, 630 (5th Cir. 2001). If the Secretary's decision was not based on a new rule, it must nevertheless comport with the APA's requirements for an individual adjudication. "Under the APA, the Secretary's decision is 'set aside if it is arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, or contrary to law.' " Baptist Health v. Thompson, 458 F.3d 768, 773 (8th Cir. 2006) (quoting St. Luke's Methodist Hosp. v. Thompson, 315 F.3d 984, 987 (8th Cir. 2003).

### A.

We turn first to the argument the 2003 plan amendment could not be rejected without an alteration of the Secretary's procedure for review through notice and comment rule making. Minnesota does not contend that Medicaid Services followed a written procedure, which it failed to subject to notice and comment. Rather, the state

argues that the procedure followed by Medicaid Services had the effect of imposing a new substantive rule. The Fifth Circuit observed in Shell Offshore that:

> An agency that, as a practical matter, has enacted a new substantive rule cannot evade the notice and comment requirements of the APA by avoiding written statements or other "official" interpretations of a given regulation. If a new agency policy represents a significant departure from long established and consistent practice that substantially affects the regulated industry, the new policy is a new substantive rule and the agency is obliged, under the APA, to submit the change for notice and comment.

238 F.3d at 630. In Shell Offshore the Department of the Interior "switch[ed] from one consistently long followed permissible interpretation to a new one without providing an opportunity for notice and comment." Id. at 629. The alteration of its existing procedures, the court determined, could not be achieved without notice and comment.

Minnesota argues that the Secretary has similarly departed from its prior practice by substantively limiting the use of intergovernmental transfers. But that contention is inconsistent with the record and the text of the Secretary's final decision. The Secretary recognized that intergovernmental transfers are permissible as a funding mechanism, see 42 U.S.C. § 1396b(w)(6)(A), but required Minnesota to explain their role in its Medicaid system. Medicaid Services's request for further information did not imply a rejection of intergovernmental transfers and therefore could not be a new substantive rule. See West Virginia v. Thompson, 475 F.3d 204, 210-11 (4th Cir. 2007); Alaska, 424 F.3d at 941-42.

Next, Minnesota argues that Medicaid Services imposed additional reporting requirements that Medicaid Services had explicitly rejected when it modified the upper payment limit in 2001, see 66 Fed. Reg. 3148 (Jan. 12, 2001), and that these requirements also constitute a new substantive rule. Compliance with the upper payment limit, however, does not prevent the Secretary from further exploring the state's 2003 plan amendment. The upper payment limit is not the exclusive measure

of a proposed state plan amendment's compliance with the requirements described in 42 U.S.C. § 1396a. As HHS explained in its 2001 upper payment limit rule, the system was implemented because:

> [a] high volume of uninsured patients had increased the costs of providing services in State government-owned or operated facilities. These costs, in turn, were passed on to the State. To offset those higher costs, States established payment methodologies that paid State government-owned or operated facilities at a higher rate than privately operated facilities. Higher Medicaid payments to State government-owned or operated facilities allowed States to obtain additional Federal Medicaid dollars to cover costs formerly met entirely by State dollars.

66 Fed. Reg. 3149. In order to limit this practice, HHS has continued to refine the upper payment limit as potential abuses of the system arise.

The upper payment limit cannot, however, curb every abuse of the Medicaid system. Because the upper payment limit is only part of the mechanism for ensuring compliance with the Medicaid statutes, it does not define the boundaries of the Secretary's obligation to review proposed state plan amendments. As the Ninth Circuit has observed, rejecting an argument similar to the one raised by Minnesota:

> [a]lthough the UPL [upper payment limit] regulations are clearly grounded in economic concerns, in that they proscribe payment levels that exceed certain limits, the terms 'efficiency' and 'economy' are nowhere defined in the Medicaid Act or its implementing regulations. Thus, we cannot equate mere compliance with the UPL regulations as conclusive proof of compliance with the broader statutory requirement.

See Alaska, 424 F.3d at 940. Thus, although Medicaid Services may have implemented the upper payment limit to provide some flexibility to states, Minnesota cannot rely on compliance with the upper payment limit to reject every effort of the Secretary to otherwise ensure compliance with the Medicaid statutes.

Accordingly, the increased scrutiny of Minnesota's 2003 plan amendment, including Medicaid Services's requests for additional information, was consistent with the Secretary's authority in an individual adjudication. "The APA does not require that all the specific applications of a rule evolve by further, more precise rules rather than by adjudication." Shalala v. Guernsey Mem'l Hosp., 514 U.S. 87, 96 (1995).

B.

We conclude that Medicaid Services did not impose a new substantive rule and thus move to considering whether the denial of the 2003 plan amendment was "arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, or contrary to law." Hennepin County Med. Ctr. v. Shalala, 81 F.3d 743, 748 (8th Cir. 1996). Minnesota argues that the Secretary failed to consider information and assurances provided by the state, particularly during the reconsideration process. The state's argument generally attacks Medicaid Services's attempt to understand Minnesota's funding system. To demonstrate the acceptability of the 2003 plan amendment, the state highlights its compliance with the upper payment limit, the permissibility of county-owned nursing homes assigning their Medicaid payments to their county-parents, and the impossibility of providing information (such as the use of Medicaid payments to local governments) that would require "micromanag[ing] local governments." Specifically, the state also suggests that the Secretary relied only on its initial response, despite an additional assurance regarding its compliance with § 1396a(a)(2) (the 40 percent rule).

Recognizing, as Minnesota argues, that the Secretary's scrutiny of its 2003 plan amendment differed from prior adjudications, the Secretary's vigilance here was not arbitrary and capricious. Baptist Health, 458 F.3d at 777; see also Smiley v. Citibank (S.D.), N.A., 517 U.S. 735, 742-43 (1996). To the contrary, the 2001 revision of the upper payment limit signaled the Secretary's commitment to detecting abusive requests for Medicaid funding. In order to discover these abuses where they exist, the Secretary's review of present state plan amendments necessarily differs from his prior practice. This does not, however, constitute "[s]udden and unexplained change or

change that does not take account of legitimate reliance on prior interpretation." Id. at 742 (citations omitted). To the extent that Minnesota argues that the decision was arbitrary and capricious simply because it was based on Medicaid Services's scrutiny of aspects of the 2003 plan amendment that may not have drawn the attention of the Secretary in past adjudications, we reject that argument.

We also determine that the decision is supported by substantial evidence in the record. See, e.g., Baptist Health, 458 F.3d at 778. According to the Secretary, Minnesota failed to provide information and assurances that the funds requested in its 2003 plan amendment would be economical and efficient, § 1396a(a)(30)(A), and in the best interests of recipients, § 1396a(a)(19). The Secretary's decision, which at base rejected Minnesota's 2003 plan amendment for lack of information, is supported by the still unresolved questions regarding the ultimate use of the Medicaid funds requested by the state, including the use of the funds by the county-owned nursing homes. The lack of information raises the specter that the required intergovernmental transfers will create the abusive funding structure that Medicaid Services is attempting to prevent. The Secretary's scepticism was thus warranted and substantial evidence supports the denial of the 2003 plan amendment.[4]

---

[4]The Secretary also relied on § 1396a(a)(2) (the 40 percent rule). Minnesota argues that it provided an assurance, during the reconsideration process, that the state funded at least 40 percent of the expenditure proposed by the 2003 plan amendment and, in any event, the requirement should not have been a basis for the Secretary's decision because the initial disapproval and hearing officer's proposed decision did not rely on the section. We need not reach either argument, however, because the Secretary's reliance on §1396a(a)(30)(A) and (a)(19) supports the rejection of the 2003 plan amendment.

## IV.

We determine that Medicaid Services's increased scrutiny of Minnesota's 2003 plan amendment neither required notice and comment rule making nor ignored adequate assurances provided by the state.

Accordingly, the petition for review is denied.

_____