# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

October 3, 2007

No. 06-30632

Charles R. Fulbruge III
Clerk

SUDO PROPERTIES, INC; HOUMA SPORTS ENTERTAINMENT, LLC

Plaintiffs - Appellants

v.

TERREBONNE PARISH CONSOLIDATED GOVERNMENT

Defendant - Appellee

Appeals from the United States District Court
for the Eastern District of Louisiana

Before HIGGINBOTHAM, WIENER, and CLEMENT, Circuit Judges.

EDITH BROWN CLEMENT, Circuit Judge:

Sudo Properties, Inc. ("Sudo") and Houma Sports Entertainment, LLC ("Houma Sports") appeal the district court's grant of summary judgment to the Terrebonne Parish Consolidated Government ("Parish"). For the following reasons, we REVERSE and REMAND for trial.

## I. FACTS AND PROCEEDINGS

From 2000 until 2004, Linda McCarthy was the director of the Houma Terrebonne Civic Center, which the Parish owned and operated. During her tenure, the civic center incurred annual losses of about one million dollars, and the Parish President repeatedly pushed McCarthy to bring in new revenue to the center to help reduce its debt.

One of McCarthy's ideas for reducing the deficit was to entice an indoor football team to the civic center. McCarthy set up Houma Sports to own and operate the team, which ultimately became known as the Bayou Bucks. In November 2001, McCarthy approached two local businessmen, Gordon Dove and Neil Suard, about investing in Houma Sports. Dove and Suard were doing business as Sudo. McCarthy prepared pro forma statements projecting income and expenses for Houma Sports. McCarthy predicted, in what she characterized as "the least optimistic estimate," an annual net profit of $142,346 for the team. McCarthy told Suard that the team would play at the civic center. She also informed Suard that, as director of the civic center, she had been able to negotiate a favorable three-year lease for Houma Sports.

In January 2002, Sudo purchased a one-third share in Houma Sports. The original members of Houma Sports were Sudo, the Houma Terrebonne Civic Center Development Corporation ("HTCCDC"), and Carolyn Schiver, president of the National Indoor Football League, each of which owned a one-third share. McCarthy controlled HTCCDC. When Sudo invested in the team, Suard believed that having HTCCDC as a fellow member was "a big, big plus."

During the first few months of its existence, McCarthy operated Houma Sports. She negotiated various contracts for advertising, as well as the contract with the team's general manager, Travis Carrell, on behalf of Houma Sports. On January 22, 2002, McCarthy faxed to Suard an amended projection of revenues and expenses that showed an increase in profit over her original projection. McCarthy's new projected annual net profit was $182,559, based on projected revenues of approximately $678,000 and projected expenses of $474,000. In February 2002, McCarthy approached Suard and suggested that he buy HTCCDC's one-third interest in Houma Sports. At that time, McCarthy told Suard that the team was doing great, but that the civic center wanted to concentrate on scheduling Broadway plays there. As Suard testified:

2

And my next question was "Okay, how are we doing financially?" She said, "Very great. Sponsorship is going great. The ticket sales are going great. We just want to get out and concentrate on Broadway." I said, "Okay. How much you want to sell out?" She said, "Just give us back whatever we have up."

Sudo purchased HTCCDC's one-third interest in March 2002. At some point in 2002, Carolyn Schiver forfeited her interest in the team when she failed to make required capital contributions to Houma Sports. Sudo then became the sole investor in Houma Sports. In April 2002, Suard became the sole owner of Sudo when he purchased his partner Dove's ownership interest.

After Suard took control of Houma Sports in March 2002, he "started getting all the bills." He testified, "[I]t was unbelievable how bad it was." He explained that "we did a settlement with the Civic Center probably sixty days after I bought the team, and I saw that it was going to be trouble." Suard testified that he realized that actual expenses for 2002 would be much higher than those projected by McCarthy and that the business "was wide open, downhill, losing money, getting ready to lose a lot more." For example, in reference to advertising contracts, he testified

> Nobody knew what was going on but Linda. . . . The expenses, the two contracts you talked about, she set us out twenty-five thousand for advertising. She already spent a hundred. No football had been kicked yet. This thing was in trouble, and she knew it. She said, "No problem, No problem." That's what the deal was.

By June 2002, the expenses for assistant coaches for five months were $6,600 more than the annual projection of $10,000. The actual costs of training and medical supplies were $61,350 by June 2002, although McCarthy had projected only $5,000 for the year. By August 2002, the team's annual expenses exceeded McCarthy's projections by over $200,000. The team lost $400,000 in its first year, in stark contrast to McCarthy's "least optimistic" projections of over $140,000 in profit. During the three-year term of the lease negotiated by McCarthy, Sudo lost over $900,000 from its investment in Houma Sports.

Although McCarthy told Suard that her motivations for selling HTCCDC's interest in the team had nothing to do with its financial condition, she revealed the true reason to HTCCDC's Board of Directors at its April 23, 2002 meeting — to get HTCCDC out of a money-losing deal that she had never intended for it to stay in. At the meeting, McCarthy stated, "I think I talked to everybody here, we decided to sell and get rid of the football team while we have a chance before the costs . . . Gordy Dove and Neil Suard want to take over the whole team." She went on to explain why HTCCDC needed to be involved in the first place: "[I]t helped me get Gordy and Neil to the table because I told them that y'all [HTCCDC's Board of Directors] were 1/3 owners, so they were like, ooh, now we've got the support of them."

For unknown reasons, the transcript of that meeting was edited, so the plaintiffs did not learn of McCarthy's statements until they acquired a taped recording of the meeting through an open records request that Suard made in response to misleading information that the Terrebonne Parish Council gave him. In early 2004, Suard initiated discussions in an attempt to renegotiate the lease to obtain more favorable terms for Houma Sports. In the course of those negotiations, representatives of the Terrebonne Parish Council incorrectly told Suard that he, not McCarthy, had negotiated the lease, implying that he was responsible for its provisions, however unfavorable. In order to determine how the original contract was negotiated, Suard made a request under Louisiana's Public Records Act for the recorded transcripts of HTCCDC meetings. In response, he received a taped recording of the April 23, 2002 meeting.

When he listened to the tape,[1] Suard heard McCarthy's remarks to HTCCDC's Board of Directors as it considered a vote to approve the sale of its one-third interest in Houma Sports. Suard learned for the first time that the

---

[1] The record does not state exactly when Suard heard the tape, but it is undisputed that he heard it within a year of filing suit.

4

Parish had intentionally misled him into investing into the team because it desperately needed a tenant at the civic center. The written minutes of the April 23, 2002 meeting had been edited and did not reflect the true discussions reflected on the tape. The tape of the actual meeting disclosed that, pursuant to a directive from the Parish President, McCarthy lied to Suard in order to obtain an investor with "deep pockets" so that the civic center would have a three-year tenant to offset its losses.

According to Suard, before he listened to the tape, he thought he had merely made a bad investment. He testified,

> [U]ntil I listened to the tape and I started looking at exactly what was going on, it was a hustle. Then, everything changed. There was no write-off now. You know, I got duped, and it wasn't by accident. It was—I'm going to call it premeditated, it was setup, and it was just no ifs ands and buts about it. So, everything change[d].

Sudo and Houma Sports filed suit against the Parish on September 10, 2004, less than one year from the date that Suard listened to the tape, but more than two-and-a-half years after he began receiving the bills for Houma Sports. Sudo asserted claims under federal and state securities law, violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), the Louisiana Unfair Trade Practice and Consumer Protection Act, and the Louisiana Blue Skies Act, and state claims for negligence and fraud. Houma Sports asserted a single claim for breach of contract. Plaintiffs claim damages exceeding $1 million.

The Parish succeeded in having the RICO claim dismissed. It then filed a motion for summary judgment for the remaining claims, asserting that the claims were time-barred by the applicable statutes of limitations and prescriptive periods. The district court found that Suard had sufficient notice

to trigger the relevant periods as of June 2002, rendering Sudo's claims time-barred.[2]  Sudo and Houma Sports appeal this judgment.

## II. STANDARD OF REVIEW

The district court's grant of summary judgment is reviewed de novo.  Shell Offshore Inc. v. Babbitt, 238 F.3d 622, 627 (5th Cir. 2001).  The court applies the same standard as the district court.  Davidson v. Veneman, 317 F.3d 503, 508 (5th Cir. 2003).  The district court's grant of "[s]ummary judgment is appropriate if the record shows 'that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.'" Shell Offshore, 238 F.3d at 627 (quoting FED. R. CIV. P. 56(c)).

## III. ANALYSIS

A.    Claims under the Securities Acts

Sudo brought claims against the Parish under both the 1933 and 1934 Securities Acts.  Claims under the 1933 Act must be brought "within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence."  15 U.S.C. § 77m.  Claims under the 1934 Act "involv[ing] a claim of fraud, deceit, manipulation, or contrivance . . . may be brought not later than the earlier of—(1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years after such violation."  28 U.S.C. § 1658(b).  For claims under both acts, "[t]he controlling date for purposes of the running of the respective statutes of limitations is when a purchaser of securities knew—or in the exercise of reasonable diligence, should have known—of the alleged wrongdoing." Topalian v. Ehrman, 954 F.2d 1125, 1133 (5th Cir. 1992).  This standard is generally referred to as "inquiry notice," and it applies "when a reasonable investor of ordinary intelligence would have discovered the information and recognized it

---

[2] The district court also dismissed Houma Sports's pendent contract claim without prejudice.

as a storm warning." DeBenedictis v. Merrill Lynch & Co., Inc., 492 F.3d 209, 216 (3d Cir. 2007); see also Margolies v. Deason, 464 F.3d 547, 553 (5th Cir. 2006). The "fact-intensive inquiry" of what constitutes inquiry notice "is typically appropriate for consideration by a jury." Margolies, 464 F.3d at 553.

The district court determined that Suard had inquiry notice of the fraud that gave rise to his claims as of June 2002, because of the dramatic discrepancies between the projected and actual expenses for that year. See Whirlpool Fin. Corp. v. GN Holdings, Inc., 67 F.3d 605, 610 (7th Cir. 1995) ("[D]ramatic discrepancies between the very precise projections made by the defendants and the actual results . . . were sufficient to give . . . inquiry notice."). We do not find the information Suard possessed at that time to have placed him on inquiry notice as a matter of law. To begin, McCarthy's representations to Suard before selling him the one-third share in Houma Sports were that the team was "doing great . . . very great. Sponsorship is going great. The ticket sales are going great." There was considerable truth to this statement—both sponsorship and ticket sales were close to the numbers McCarthy projected. Suard, therefore, received mixed information about the accuracy of McCarthy's projections.

Moreover, when McCarthy met with Suard to discuss the possibility that he might buy HTCCDC's share of Houma Sports, McCarthy told him that the reason she wanted to sell was so she could concentrate on bringing Broadway-style musicals to the Civic Center. Suard never received any information contradicting this assertion until he heard the recording of the April 23, 2002 meeting. As of June 2002, the only fact Suard knew for certain was that McCarthy's projections for the expenses for running the Bayou Bucks were wrong by a wide margin. He had no information that would lead him to suspect that she had deliberately misstated the projections or saddled him with a failing business for some ulterior purpose. Nor did he possess information that could

not be resolved with McCarthy's assertions about the team without an inference that she deliberately misled him. As Suard argued to the district court, based on the knowledge he had at the time, he reasonably inferred that he had simply "made a bad business decision."

Suard's situation was different from that of the investors in McGill v. Goff, who were told that the property purchased via a joint venture would be bought out "quickly," or within a year of their investment, made the investment, and then received a copy of the joint venture agreement stating only a "desire" to sell the property within five years. 17 F.3d 729, 733 & n.6 (5th Cir. 1994), overruled on other grounds by Kansa Reinsurance Co. v. Congressional Mortgage Corp., 20 F.3d 1362, 1373–74 (5th Cir. 1994). Suard could have easily interpreted the disjunction between McCarthy's projections and reality to be the fault of her poor judgment; in contrast, McGill featured a seller of the investment who had complete control over the amount of time the investment was to be held so any conflicting statements in the written agreement served as an obvious indictment of his integrity. In McGill, the "terms of the agreement," as written, reflected a completely different understanding from what had been orally represented before the investment. Id. at 733; see also Martinez Tapia v. Chase Manhattan Bank, 149 F.3d 404, 409–10 (5th Cir. 1998) ("A written statement available to the victims of fraud that reveals that a fraud has been committed furnishes constructive or inquiry notice of the fraud.").

Nor does Suard's level of notice parallel that in Jensen v. Snellings, 841 F.2d 600 (5th Cir. 1988). In Jensen, we noted that "[i]nvestors are not free to ignore 'storm warnings' which would alert a reasonable investor to the possibility of fraudulent statements or omissions in his securities transaction." Id. at 607. The plaintiffs received "on-going assurances of profits or, at most, minimal losses," from the defendant during the course of their investment in a cattle-feeding plan, but knew by April 1979 that they had lost approximately

$290,000. Id. They also had been told by the president of the financial services company that managed the investment that the defendant "had woven a 'fairy tale' and 'gouged' them, [and he was a] 'scalawag'" who should be disbarred. Id. at 607–08. We held that this information was sufficient to constitute "storm warnings," such that the plaintiffs ought to have investigated further, and, therefore, their claims filed in September 1981 were prescribed. Id. at 608. In this case, Suard was never told by anyone that McCarthy was dishonest, disreputable, or otherwise acting inappropriately. Again, as of the summer of 2002, Suard only knew that McCarthy's predictions regarding the Bayou Bucks' expenses had been grossly incorrect. This was not sufficient to create notice inquiry as a matter of law. See Breen v. Centex Corp., 695 F.2d 907, 912 (5th Cir. 1983) (holding that failure to reach earnings levels was not sufficient, by itself, to put the plaintiff on notice inquiry, as "[a] myriad of valid business reasons could have caused" this problem). It was not until Suard heard the tape of the April 23, 2002 meeting in 2004 that he had any indication that McCarthy had misled him. The district court thus erred when it dismissed Sudo's claims under the Securities Acts.

B.    Claims under state law

Sudo's claim under Louisiana's Blue Skies Law is governed by a prescriptive period of two years. LA. REV. STAT. 51:714C(1). Sudo's other Louisiana tort claims have a prescriptive period of one year. LA. CIV. CODE art. 3492. A prescriptive period begins to run when the injured party has constructive knowledge of the facts that would entitle him to bring a suit. Campo v. Correa, 828 So. 2d 502, 510 (La. 2002). Information or knowledge that ought to excite attention and put the alleged victim on guard is sufficient to start the running of prescription. Id. at 510–11. For the same reasons articulated above, we find that Suard did not have sufficient information to be entitled to bring a suit prior to 2004. Had he sued based on the facts known to him in the

9

summer of 2002, he would have been unable to prevail because he lacked any evidence that McCarthy willfully deceived him. The prescriptive period for these claims thus did not begin to run until he heard the tape of the April 23, 2002 meeting in 2004. Suard filed this lawsuit on September 10, 2004; therefore, the claims are not time-barred.

C.    Houma Sports's claim

Because the district court erroneously dismissed Sudo's federal claims, it, therefore, also erroneously dismissed Houma Sports's pendent state law claim. See Corwin v. Marney, Orton Invs., 843 F.2d 194, 200 (5th Cir. 1988). We thus reverse this dismissal as well.

## IV. CONCLUSION

For the foregoing reasons we REVERSE the dismissal of Sudo's claims and REMAND the case to the district court.